PEOPLE v DeKORTE

Docket No. 203238. Submitted October 6, 1998, at Grand Rapids. Decided
January 29, 1999, at 9:15 A.M. Leave to appeal denied, 460 Mich ___.

Garth C. DeKorte, a case manager at a foster care facility for mentally
ill adults, was convicted by a jury in the Calhoun Circuit Court,
James C. Kingsley, J., of abuse of a vulnerable adult, second
degree. The defendant had refused to authorize an emergency
room visit for a facility resident, thus delaying treatment for a frac-
tured pelvis and left elbow and a dislocated hip and left elbow for
sixteen hours. The defendant appealed, claiming that the evidence
was insufficient to support the conviction.

The Court of Appeals *held*:

To support a conviction of second-degree vulnerable adult abuse,
MCL 750.145n(2); MSA 28.342A(n)(2), the prosecution must prove
that the defendant was a caregiver or other person with authority
over the vulnerable adult, that the defendant engaged in a reckless
act or reckless failure to act, and that the reckless act or reckless
failure to act caused serious physical harm or serious mental harm
to the vulnerable adult. Here, it was not disputed that the defend-
ant was a caregiver and that the alleged victim was a vulnerable
adult. With respect to reckless act or reckless failure to act—
defined by MCL 750.145m(p); MSA 28.342A(m)(p) as conduct that
demonstrates a deliberate disregard for the likelihood that the nat-
ural tendency of the act or failure to act is to cause physical harm,
serious physical harm, or serious mental harm—a rational trier of
fact could have found that the defendant had demonstrated a delib-
erate disregard for the likelihood that the alleged victim would suf-
fer additional physical harm. Concerning the final element of seri-
ous physical harm—defined by MCL 750.145m (r); MSA 28.342A
(m) (r) as physical injury that threatens the life of a vulnerable
adult, that causes substantial bodily disfigurement, or that seriously
impairs the functioning or well-being of the vulnerable adult—
neither the threat of death nor pain suffered by the alleged victim
as a result of the defendant's actions constituted physical injury to
the alleged victim. Accordingly, the evidence was insufficient for
conviction.

Reversed.

CORRIGAN, C.J., dissenting, stated that "physical injury," as used in the second-degree vulnerable adult abuse statute encompasses bodily pain that seriously impairs the functioning or well-being of the vulnerable adult, and that the defendant caused the victim such pain as to be guilty of second-degree vulnerable adult abuse.

1. CRIMINAL LAW — SECOND-DEGREE VULNERABLE ADULT ABUSE — ELEMENTS.

Abuse of a vulnerable adult, second degree, is established upon proof that the defendant was a caregiver or other person with authority over the vulnerable adult, that the defendant engaged in a reckless act or reckless failure to act, and that the reckless act or reckless failure to act caused serious physical harm or serious mental harm to the vulnerable adult (MCL 750.145n[2]; MSA 28.342A[n][2]).

2. CRIMINAL LAW — SECOND-DEGREE VULNERABLE ADULT ABUSE — SERIOUS PHYSICAL HARM.

Threat of death or pain experienced by a vulnerable adult as a result of a caregiver's decision not to seek immediate medical treatment for physical injury sustained by the vulnerable adult is not physical injury for the purposes of the statute that proscribes abuse of a vulnerable adult, second degree (MCL 750.145n[2], 750.145m[r]; MSA 28.342A[n][2], 28.342A[m][r]).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *David G. Edick*, First Assistant Attorney General, for the people.

*Willey & Chamberlain LLP* (by *Charles E. Chamberlain, Jr.*), for the defendant.

Before: CORRIGAN, C.J., and DOCTOROFF and FITZGERALD, JJ.

FITZGERALD, J. Defendant was convicted by a jury of abuse of a vulnerable adult, second-degree, MCL 750.145n(2); MSA 28.342A(n)(2), and was sentenced to five years' probation, with the condition that defendant serve one year in jail, consisting of four months' imprisonment followed by sixty days on a

tether, with the remaining six months suspended.[1] Defendant appeals as of right. We reverse.

The victim in this case is a 340-pound schizophrenic woman who was a patient at Newport Center, a specialized adult foster care facility for chronically mentally ill adults. The victim was placed at the facility as a result of being found not guilty of an offense by reason of insanity in 1994. On July 12, 1995, at approximately 9:00 P.M., the victim jumped or fell off the roof of the facility[2] and onto the cement parking lot. The victim thereafter complained of pain and paralysis, and a house coordinator at the facility contacted defendant, the victim's primary case manager, to inform him of what had happened. Defendant, who was informed that the victim had indicated that she would get up off the ground if the staff would provide her with a cigarette, instructed the house coordinator to prompt the victim to get up if she was able and to advise him of any changes in the victim's medical condition. After assisting the victim into the facility and evaluating her condition, the house coordinator informed defendant that the victim continued to complain of pain. Defendant, noting that an emergency room visit would cost approximately $1,500 and that a physician's visit would cost approximately $50, advised the house coordinator to have the residential administrator arrange a physician's appointment for the victim for the following day.

Approximately sixteen hours following the fall, the victim was transported to a hospital by ambulance.

---

[1] Defendant was released on bond pending appeal.

[2] The victim fell from a height of approximately twelve to fourteen feet.

She was diagnosed with a fractured pelvis and left elbow and a dislocated hip and left elbow.

Defendant argues that the prosecution presented insufficient evidence to support defendant's conviction of second-degree vulnerable adult abuse. This Court reviews sufficiency of the evidence claims by considering the evidence in the light most favorable to the prosecution and determining whether a rational trier of fact could have found that the essential elements of the charged crime were proved beyond a reasonable doubt. *People v Head*, 211 Mich App 205, 210; 535 NW2d 563 (1995).

MCL 750.145n(2); MSA 28.342A(n)(2), the second-degree vulnerable adult abuse statute, provides:

> A caregiver or other person with authority over the vulnerable adult is *guilty* of vulnerable adult abuse in the second degree *if the reckless act or reckless failure to act* of the caregiver or other person with authority over the vulnerable adult *causes serious physical harm* or serious mental harm to a vulnerable adult. [emphasis added.]

To establish the crime of second-degree vulnerable adult abuse, the prosecutor must prove (1) that the defendant is a caregiver or other person with authority over the vulnerable adult, (2) that the victim is a vulnerable adult, (3) that the defendant engaged in a reckless act or reckless failure to act, and (4) that the reckless act or reckless failure to act caused serious physical harm or serious mental harm to a vulnerable adult.

The parties do not dispute that defendant, as the victim's primary case manager, was a caregiver and that the victim was a vulnerable adult as defined under the vulnerable adult abuse statute. See MCL

750.145m(c) and (u); MSA 28.342A(m)(c) and (u). Thus, the first and second elements of the offense are not at issue.

The third element of the offense requires proof that the defendant engaged in a reckless act or reckless failure to act. The statute defines a "reckless act or reckless failure to act" as "conduct that demonstrates a deliberate disregard for the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm." MCL 750.145m(p); MSA 28.342A(m)(p). The statute defines serious physical harm as "physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145m(r); MSA 28.342A(m)(r).[3]

Here, there is no dispute that defendant was advised that the victim had fallen or jumped off the roof to the concrete below and that the victim was complaining of pain and paralysis following the fall. Douglas Segan, an emergency medicine physician, opined that when one is dealing with an injured person who is complaining of pain following a fall, the injured must be immobilized and medical help must be obtained. Moreover, Segan opined that a fall from a height of twelve to sixteen feet could possibly lead to a multitude of fractures and physical injuries. Segan further opined that a person complaining of

---

[3] The prosecution does not contend on appeal that defendant's allegedly reckless act or reckless failure to act caused serious mental harm.

pain and being semiconscious following such a fall could possibly have suffered life-threatening injuries.

Given this evidence, defendant's failure to summon immediate medical attention demonstrated a deliberate disregard for the likelihood that the victim would suffer additional serious physical harm. Therefore, we conclude that the prosecution presented sufficient evidence to establish the "reckless act or reckless failure to act" element of second-degree vulnerable adult abuse.

The fourth element of the offense requires proof that defendant's reckless act or reckless failure to act caused serious physical harm. As previously noted, "serious physical harm" is defined as "physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." The prosecution's theory was that the "threat of death" and "pain" constitute physical injuries.

Because the Legislature did not define the phrase "physical injury," this Court must give those words their common, ordinary meanings. *People v Fields*, 448 Mich 58, 67; 528 NW2d 176 (1995). In ascertaining the meaning of words, this Court may refer to dictionaries for guidance. *People v Wilson*, 230 Mich App 590, 592; 585 NW2d 24 (1998). *Random House Webster's College Dictionary* (1997), pp 672 & 983, defines the term "physical" as "of or pertaining to the body" and the term "injury" as "harm or damage done or sustained." Clearly, the mere threat of death does not constitute a physical injury.

"Pain" is defined as "physical suffering typically *from an injury or illness." Random House Webster's*

*College Dictionary* (1997), p 972. No published Michigan decision has addressed, in the context of the vulnerable adult abuse statute, whether evidence of pain is sufficient to satisfy the "physical injury" element. However, in the context of a claim for negligent infliction of emotional distress, which requires a plaintiff to establish that the emotional distress manifested itself in definite and objective physical injury, it has been held that a general claim of pain and suffering will not suffice. *Parnell v Booth Newspapers, Inc*, 572 F Supp 909, 917 (WD Mich, 1983). See also *Stites v Sundstrand Heat Transfer, Inc*, 660 F Supp 1516, 1526-1527 (WD Mich, 1987). In light of *Parnell*, and given that pain is merely a "symptom" of an injury or illness, we conclude that pain alone does not constitute a "physical injury."[4]

Although hypothetical testimony was presented regarding medical complications that could result from a fall similar to the one in the present case, absolutely no evidence was presented that the victim suffered a physical injury as the result of the delay in medical treatment. Orthopedic surgeon John Morgan, who saw the victim on July 13, 1995, was unable to say with any reasonable degree of medical certainty that the victim sustained any physical injury apart from the initial fall. Dr. Segan, who had never examined the victim, testified that he could not say with certainty that the movement of the victim had aggravated her physical injury. The prosecution did not present any evidence to contradict this medical testimony. In the absence of any evidence that

---

[4] Indeed, a medical expert testified that pain is generally a symptom of a physical injury rather than a physical injury itself.

defendant's failure to summon immediate medical attention caused a physical injury to the victim, we conclude that the evidence is insufficient to support defendant's conviction.

In light of our disposition of this issue, we need not address defendant's claim of instructional error.

Reversed.

DOCTOROFF, J., concurred.

CORRIGAN, C.J. (*dissenting*). I respectfully dissent. Unlike the majority, I would hold that the prosecution presented sufficient evidence to support defendant's conviction of second-degree vulnerable adult abuse, MCL 750.145n(2); MSA 28.342A(n)(2). Defendant, a social worker, acted as the gatekeeper regarding emergency medical services for the Newport Center's adult foster care clients, requiring that all employees obtain his approval before arranging for medical services or risk personal liability for their cost. The jury properly concluded that defendant's decision to deny emergency services for this victim was a criminal act.

A

To support a conviction of second-degree vulnerable adult abuse, the prosecution must prove that (1) the defendant was a caregiver or other person with authority over the victim, (2) the victim was a vulnerable adult, (3) the defendant recklessly acted or failed to act, and (4) the defendant's recklessness "cause[d] serious physical harm or serious mental harm to the vulnerable adult." MCL 750.145n(2); MSA 28.342A(n)(2). In this case, the prosecutor proceeded

under a theory that defendant's recklessness caused "serious physical harm," not "serious mental harm."[1]

The Legislature defined the phrase "serious physical harm" as "a physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145m(r);  MSA 28.342A(m)(r). This Court must apply the phrase as expressly defined. *People v Chupp*, 200 Mich App 45, 49; 503 NW2d 698 (1993). Therefore, under the clear language of the statute, the defendant's recklessness must cause a "physical injury" that either (1) threatens the life of a vulnerable adult, (2) causes substantial bodily disfigurement, or (3) seriously impairs the functioning or well-being of the vulnerable adult.

I agree with the majority that evidence that defendant's recklessness threatened the life of the victim was not, by itself, sufficient to support a conviction. I cannot, however, join in the majority's conclusion that bodily pain does not constitute a "physical injury" for purposes of the statute. The construction of the statute is a question of law for this Court. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998). In construing the statute, this Court's purpose is to ascertain the reasonable meaning of the specific language employed by the Legislature. *People v Vronko*, 228 Mich App 649, 655; 579 NW2d 138 (1998); *People v Armstrong*, 212 Mich App 121, 127; 536 NW2d 789 (1995).

---

[1] For purposes of the statute, "serious mental harm" means "a mental injury that results in a substantial alteration of the mental functioning that is manifested in a visibly demonstrable manner." MCL 750.145m(s); MSA 28.342A(m)(s).

Because the Legislature did not define the phrase "physical injury," this Court must give those words their common, ordinary meanings. *Webb, supra* at 274; *People v Fields*, 448 Mich 58, 67; 528 NW2d 176 (1995). In ascertaining the common meaning of words, this Court may refer to dictionaries for guidance. *People v Wilson*, 230 Mich App 590, 592; 585 NW2d 24 (1998). *Random House Webster's College Dictionary* (1997), pp 672 & 983, defines the term "physical" as "of or pertaining to the body" and the term "injury" as "harm or damage done or sustained." *Webster's New Collegiate Dictionary* (1974), pp 594 & 866, similarly defines the term "physical" as "of or relating to the body" and the term "injury" as "hurt, damage, or loss sustained." Those dictionaries define the term "pain" as "[usually] localized physical suffering associated with a bodily disorder (as a disease or an injury)," *Webster's New Collegiate Dictionary* (1974), p 824, and "physical suffering typically from injury or illness," or "an instance of such suffering; a distressing sensation in part of the body." *Random House Webster's College Dictionary* (1997), p 972. Accordingly, giving the statutory language its common meaning, I would hold that the phrase "physical injury" encompasses bodily pain because pain both relates to the body and is harmful or hurtful.

B

In this case, the question is whether the prosecution proved that defendant's recklessness caused the victim bodily pain that affected her in one of the three ways set forth in the statute.[2] Unlike the major-

---

[2] I agree with the majority that a reasonable jury could conclude that defendant's refusal to arrange for proper medical care for the victim was

ity, I would hold that a reasonable jury could find that defendant caused the victim bodily pain. That defendant's act was not the sole cause of harm to the victim does not relieve him of culpability. His recklessness need only be a proximate cause. See *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325 (1996), amended 453 Mich 1204 (1996); *People v Tims*, 449 Mich 83, 95; 534 NW2d 675 (1995). As such, to establish causation, the prosecution had only to prove that defendant's recklessness exacerbated the victim's pain. The prosecution unquestionably met this burden by presenting overwhelming evidence establishing that the victim spent sixteen or seventeen hours in excruciating pain as the result of defendant's reckless failure to act, i.e., to authorize emergency medical services. The prosecution also met its burden of proof regarding the severity of the harm by establishing that the victim's pain seriously impaired her functioning or well-being.

According to Newport Center employees, defendant established the center's policy regarding emergency medical services (EMS). Under the policy, the employees were required to contact a case manager for authorization to obtain medical treatment for a resident. Thomas Horrocks, the center's residential administrator, described the manner in which defendant responded to attempts to change the policy before the victim's injury:

> On a number of occasions I had input into the need to revise the policy in order to be able to better respond to cli-

---

conduct that demonstrated a deliberate disregard for the likelihood that the natural tendency of his failure to act was to cause the victim serious physical harm.

ent and patient needs; however, all attempts to change the
policy were vetoed by Mr. DeKorte and through threats and
intimidation he refused to allow myself or any other staff
member to change that policy.

*        *        *

One [occasion] in particular that comes to my mind is a
situation in July of 1995 previous to [the victim's] incident
in which I made a statement in a meeting that I would be
calling 911 to get appropriate care for the patients if they
needed it, and Mr. DeKorte told me that I needed to start
filling out my resume and looking for another job, and that I
would be paying for costs of these hospital services and
that it costs $50 to send a person to a doctor and $1,500 to
send them to the emergency room, and that it was his call
as case manager to determine when services were
appropriate.

Two weeks after the criminal episode under review,
defendant instructed a center employee to alter the
policy to reflect that employees should contact the
residential administrator, not the case manager,
before taking action. Defendant further requested that
the employee backdate the policy change, but the
employee could not recall at trial whether the date
fell before or after the date of the victim's injury.[3]

In compliance with the standing EMS policy, Wayne
Devette, the house coordinator, phoned defendant
shortly after discovering the victim to report the vic-
tim's complaints of pain and paralysis. Defendant
instructed Devette to check the victim's vital signs

---

[3] Defendant's practice of backdating documents did not end with the
EMS policy. In response to an investigation into the incident, defendant
prepared several reports regarding the care provided for the victim during
periods ending in 1994, February 1995, and May 1995. Although he pre-
pared the reports in August 1995, defendant dated his signature to corre-
spond with the end of the period covered, not the date the reports were
actually prepared and signed.

and encourage her to stand and move inside even though she had suffered a shattered pelvis, dislocated hip, and dislocated elbow. One of the employees at the scene refused to participate in moving someone who was so seriously injured. Other employees, however, assisted the victim in walking to the building.

Devette phoned defendant again as the victim sat in a chair near his office. Defendant ordered Devette to continue monitoring the victim's condition, reiterating that "it would cost $1,000 to go to the hospital, and it would be $50 to make a doctor's appointment for her." Following defendant's instructions, Devette left a note on Horrocks' desk requesting that he schedule a doctor's appointment for the victim. The victim was eventually moved to the living room floor, where she spent the night.

After arriving at work at 8:00 A.M., Horrocks scheduled a doctor's appointment for the victim later that day. Horrocks then spoke to defendant about obtaining immediate treatment for the victim. Defendant refused, stating that the victim was manipulative and engaging in histrionics. He instructed Horrocks to get the victim ready for her appointment. Defendant also refused Horrocks' request that he immediately personally assess the victim's condition. Horrocks attempted to implement defendant's orders, but the victim could not raise herself from the floor. She urinated on her clothing because she could not walk to the restroom. Throughout the morning, Horrocks repeatedly requested that defendant examine the victim to assess her injuries, but he declined.

Defendant first saw the victim approximately three or four hours after arriving at work. Even after speaking with her and observing her inability to move,

defendant declined to arrange for immediate medical treatment. Instead, he encouraged the victim to get up and dress herself for her doctor's appointment. The victim missed her appointment because she could not move from the living room floor. At 2:00 P.M., Horrocks, acting without defendant's authorization while defendant was at lunch, called EMS to transport the victim to the hospital.

This evidence clearly demonstrates that defendant's actions seriously impaired the victim's functioning or well-being. As a result of defendant's reckless decisions, the victim spent sixteen or seventeen hours in excruciating pain from a shattered pelvis, and a dislocated hip and elbow. During this period, the victim lay on the floor in agony, unable to move or care for herself, risking additional complications from her injuries. Indeed, the treating orthopedic surgeon described the pelvic fracture as unstable. The act of moving the victim increased the risks of hemorrhage and blood clots and posed a threat to her life. A jury could reasonably find on the basis of this evidence that the defendant's recklessness caused the victim severe pain that seriously impaired her functioning or well-being. Therefore, I would hold that the prosecution presented sufficient evidence to support defendant's conviction.