PEOPLE v HUDSON

Docket No. 218497. Submitted November 10, 1999, at Lansing. Decided
     May 26, 2000, at 9:05 A.M.

> Karen Hudson was bound over for trial in the Ingham Circuit Court
> on one count of second-degree vulnerable adult abuse, following a
> preliminary examination in the 54B District Court, David L. Jordon,
> J. The action was commenced after an elderly resident at the long-
> term-care facility where the defendant, a nurse, worked fell and
> was injured after the defendant removed restraints that had been
> placed on the resident by another nurse. The circuit court, Law-
> rence M. Glazer, J., denied the defendant's motion to quash the
> bindover and dismiss the information. The defendant appealed by
> leave granted, alleging that the evidence presented at the prelimi-
> nary examination was insufficient to support the decision to bind
> her over for trial.
>
> The Court of Appeals *held*:
>
> 1. The prosecution had to introduce evidence at the preliminary
> examination that established probable cause to believe, first, that
> the defendant was a caregiver or other person with authority over
> the vulnerable adult, second, that the victim was a vulnerable adult,
> third, that the defendant engaged in a reckless act or reckless fail-
> ure to act, and fourth, that the reckless act or reckless failure to
> act caused serious physical or mental harm to the vulnerable adult.
> The defendant does not contest that she was a caregiver or that the
> alleged victim was a vulnerable adult who suffered serious physical
> harm.
>
> 2. There was insufficient evidence to support a finding of proba-
> ble cause to believe that the defendant engaged in a reckless act or
> failure to act. The evidence was insufficient to show that the
> defendant's act or failure to act, even if reckless, actually caused
> the victim to fall and be injured. The evidence regarding actual cau-
> sation was insufficient to support the bindover.
>
> 3. The district court abused its discretion in binding the defend-
> ant over for trial. The circuit court erred in denying the motion to
> quash the bindover and dismiss the information.
>
> Reversed.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *David G. Edick,* Assistant Attorney General, for the people.

*Smith Haughey Rice & Roegge* (by *Richard C. Kraus*), for the defendant.

Before: SAWYER, P.J., and HOOD and WHITBECK, JJ.

PER CURIAM. Following a preliminary examination, the district court bound defendant Karen Hudson over for trial on one count of second-degree vulnerable adult abuse, MCL 750.145n(2); MSA 28.342A(n)(2), a felony. The circuit court denied Hudson's subsequent motion to quash the bindover. This Court granted Hudson leave to appeal. We reverse.

I. BASIC FACTS

Hudson is a nurse.[1] In 1995, she worked at the Greenery Health Care Center, a long-term-care facility, in Howell. Eighty-five-year-old Mary Parle began living at the Greenery in June 1995 after physicians determined that she had insulin-dependent diabetes and vascular dementia. Parle's health conditions occasionally caused her to become agitated and aggressive. During these episodes, she would hit, pinch, kick, or slap staff and other residents at the Greenery. Consequently, Greenery staff initially used restraints with her, typically without physician approval or

---

[1] The parties refer to Hudson as a "restorative" nurse but do not explain what, if any, significance we should attach to that distinction. This term may refer to her duties assessing patient restraints.

other authorization.[2] Those restraints included a reclining chair known as a geri-chair,[3] a chair with a vest restraint, and a chair with a nonskid pad. However, Parle was able to escape each of these restraints and, in doing so, had a history of injuring herself. For instance, in mid-July 1995, Parle fell out of her bed while trying to climb over the side rails even though she was medicated. In early August 1995, Greenery staff found Parle sitting on the floor in front of her wheelchair with a soft belt restraint untied and wound around her neck. Later that same year, in mid-September, staff found Parle walking around the facility with her wheelchair attached to her by a belt restraint. After the state cited the facility for excessively using restraints on Parle,[4] her doctor ordered Greenery staff to discontinue using all restraints on her. Instead, the doctor directed the staff to "supply 1:1 supervision/redirection if necessary."

---

[2] MCL 333.20201(2)(l); MSA 14.15(20201)(2)(l) of the Public Health Code provides that a patient is entitled to freedom from restraints unless restraints are authorized in writing or necessary because of an emergency:

A patient or resident is entitled to be free from mental and physical abuse and from physical and chemical restraints, except those restraints authorized in writing by the attending physician for a specified and limited time or as are necessitated by an emergency to protect the patient or resident from injury to self or others, in which case the restraint may only be applied by a qualified professional who shall set forth in writing the circumstances requiring the use of restraints and who shall promptly report the action to the attending physician. In case of a chemical restraint a physician shall be consulted within 24 hours after the commencement of the restraint.

[3] A "geri-chair" is similar to a recliner, with a tray table that locks in place. Bonnie Schuler, a licensed practical nurse, testified the chair is difficult to "escape" when in the reclined position, but that Parle was adept at escaping.

[4] Notes regarding Parle's care showed that Greenery staff restrained her in a geri-chair seventeen times between July and October 1995.

The roof over the E-wing, where Parle resided, leaked from October 2 through 5, 1995. In order to manage the water flowing into the building from the roof, Greenery staff placed buckets and towels in the hallway. Water, nevertheless, remained on the floor. The nursing notes for the day shift on October 5 indicate that, despite this hazard, staff saw Parle walking around the facility, going into other patients' rooms, and trying to sleep in their beds that day. Bonnie Schuler, a licensed practical nurse in charge of the night shift for E-wing and part of D-wing, learned that at about 11:00 P.M. or 11:30 P.M. Parle was wandering the halls again, and this time she was walking into other patients' rooms and slapping them. Schuler later explained that she believed that Parle was a threat to the other residents. However, she could not supervise Parle because she had to administer a treatment for another patient, which would take nearly an hour to perform, and the Greenery was understaffed. With no one available to supervise Parle, Schuler decided to restrain Parle in a geri-chair with a tray top in the hallway across from the nurses' station near the intersection of wings D and E. Schuler neither sought physician approval for her decision nor documented her decision or reasoning in Parle's chart at the time she restrained Parle.[5]

About thirty minutes after Schuler restrained Parle and began treating the other resident, an aide told Schuler that Parle had fallen. Schuler found Parle on

---

[5] Schuler claimed that she had the authority to restrain Parle under a facility policy that permitted emergency restraints for no longer than twenty-four hours. Schuler considered the combination of the hazard caused by the wet floors and Parle's combativeness to constitute an emergency.

the floor of the D-wing hallway in view of the nurses' station. Despite the leaky roof, this area was, evidently, dry and unobstructed. Parle, who was wearing slippers, was lying on her right side when Schuler and the aide helped her up from the floor. The nurses placed her in a wheelchair and took her to her room. After assessing Parle's condition, Schuler went back to the nurses' station and questioned Hudson about the incident. Hudson stated that she had released Parle from her restraints. When Schuler asked why Hudson did not check with her first, Hudson reportedly stated that when she came on duty the only person she saw was another nurse who had been known to restrain patients without good reason and there was no one around with whom she could consult about the proper course of action.

Parle went to the hospital the next day. X-rays indicated that Parle had broken her hip in the fall. She stayed in the hospital until mid-October 1995, and when she returned to the Greenery, staff members had to feed her with a tube. Parle could no longer walk and seldom talked. She died several months after her accident.

## II. PROCEDURAL HISTORY

Initially, the prosecutor charged Hudson with one felony count of second-degree vulnerable adult abuse, MCL 750.145n(2); MSA 28.342A(n)(2), and two counts of alteration or destruction of patient medical records, MCL 750.492a; MSA 28.760(1). The prosecutor later voluntarily dismissed one of the counts relating to medical record alteration or destruction.

At the preliminary examination, the district court outlined its view of the sufficiency of the evidence required to bind over a criminal defendant for trial:

> The parties are not really disputing the quantum of evidence which is required stated differently from perhaps authorities noted that the people have to show probable cause to believe the offense occurred and probable cause exist[s] to believe defendant did it. And if there is a jury submissable issue, if the evidence does not show beyond a reasonable doubt, that is if there's less than proof beyond a reasonable doubt, that's still a jury submissable issue. But there has to be evidence on each element of each offense.

The district court then held that the prosecutor had provided sufficient evidence to meet the probable cause standard on the second-degree vulnerable adult abuse count but not on the remaining count concerning alteration of a record. Explaining its decision on the second-degree vulnerable adult abuse count, the district court stated:

> Now as to count one, the—the status of Miss Hudson as a covered—a person addressed by the statute is not disputed and that's certainly established. And the harm being a broken hip, being sufficiently serious, is not disputed. I appreciate the—there—there may be some reasons why a jury might think about this and might not have seen this particular fracture or the fall, but for this—for this record, I don't think that's disputed. But . . . whether this was a reckless act or a reckless failure to act and whether there was a cause in the sense required by the statute are the two grounds argued and argued most forcefully. With respect I disagree with Mr. Kraus [Hudson's counsel], not as to merely the release, but the release under the conditions present, which were of two important parts. That is that the facility was in disrepair because of the water and the confusion going on and because I believe there's evidence to show that the victim, Miss Parle, was in an agitated state.

And I think that's a fair inference for a jury to draw related to the evidence here. When—when I don't think that the release in and of itself is the—is the gravamen of the act. It's the release without making appropriate assurance of there to be proper supervision, and—and I think it is those two things together.

With respect to Mr. Kraus' review of the nursing progress report, or set of reports, exhibit eighteen, I think there is sufficient evidence of Miss Parle being a fall risk in an agitated state to require this ongoing supervision. The decision to release I think had to factor into it problems with whether there was improper restraint versus what sort of safeguards, if any, would be taken upon release. And I think the flooded condition and obstructions and so on were all part of that decision. And would require, upon release, there to be a sufficient supervision to assure that she wouldn't fall. Instead there was no supervision at all, that I can see so, it's a combination of an act and a failure to act that meet[s] . . . what I think, again, as I identified appropriately is deliberate disregard. I think it was more than a mistake. I don't hold Mr. Edick [the prosecutor] to just that comment. I think it was more than a mistake, again, not just the release itself, but the release and the failure to supervise until some other nursing staff assuredly had Miss Parle's care back in hand.

Hudson moved in the circuit court to quash the bindover order and to dismiss the information. The circuit court denied this motion, stating:

There are four facts which are decisive, and I am going to say to you that it's a close question. Fact number one is that the defendant removed the restraints upon the patient without taking any action to learn who had put the restraints on or why, according to the record before the district judge. Fact number two, that the plaintiff's fall—the patient's fall occurred 20 feet from the wheelchair, according to the record. In other words, this patient was allowed to move 20 feet from a wheelchair, and there is no evidence that anybody saw her or personally supervised her during the time

that it took her to move that 20 feet. So she definitely was not meaningfully supervised. Fact number three, the patient had at least two prior falls and, fact number four, the existence of notes indicating that in order to ambulate independently, this patient should have sturdy shoes, which she definitely did not have on that night.

So I feel there was evidence from which a jury could conclude that the piling up of these four facts and risk factors would amount to a very high likelihood of an injury or risk of injury such that the release from the restraints without supervision would amount to a reckless act and, therefore, as I say, although it is a close question, I will deny the motion.

### III. HUDSON'S ARGUMENT

On appeal, Hudson argues that the evidence introduced at the preliminary examination was insufficient to bind her over on the abuse count. Specifically, she claims that (1) there was no evidence that her act was "reckless" under the statute because she did not release Parle from her restraints with "deliberate disregard" and (2), even if releasing Parle from her restraints was "reckless," the record completely lacked evidence that releasing the restraints proximately caused Parle's fall and injuries because (a) Parle had no difficulty walking regardless of supervision by caregivers and the type of footwear she may have been wearing at the time of the accident and (b) there was no evidence that she actually was unsupervised after Hudson released her. Accordingly, she contends, the district court erred in binding her over for trial and the circuit court erred in denying her motion to quash the bindover order and dismiss the information.

## IV. STANDARD OF REVIEW

We review for an abuse of discretion a district court's decision to bind over a defendant. *People v Hamblin*, 224 Mich App 87, 91; 568 NW2d 339 (1997). "The standard for reviewing a decision for an abuse of discretion is narrow; the result must have been so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias." *People v Torres (On Remand)*, 222 Mich App 411, 415; 564 NW2d 149 (1997). A circuit court's decision with respect to a motion to quash a bindover order is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. See, generally, *People v Reigle*, 223 Mich App 34, 36; 566 NW2d 21 (1997); *People v Neal*, 201 Mich App 650, 654; 506 NW2d 618 (1993). In other words, this Court reviews the circuit court's decision regarding the motion to quash a bindover only to the extent that it is consistent with the district court's exercise of discretion. The circuit court may only affirm a proper exercise of discretion and reverse an abuse of that discretion. Thus, in simple terms, we review the district court's original exercise of discretion.

Because the question whether to dismiss the information is inextricably connected to whether the district court erred in binding over a defendant, a circuit court's decision *not* to dismiss the information may be reversed only if the district court abused its discretion in binding over the defendant. See *People v*

*Honeyman,* 215 Mich App 687, 691; 546 NW2d 719 (1996).

V. LEGAL STANDARD TO BIND OVER A DEFENDANT

MCL 766.13; MSA 28.931 establishes a magistrate's responsibility when presiding over a preliminary examination:

> If it shall appear to the magistrate at the conclusion of the preliminary examination that a felony has been committed and there is probable cause for charging the defendant therewith, the magistrate shall forthwith bind the defendant to appear before the circuit court of such county, or other court having jurisdiction of the cause, for trial.

See also MCR 6.110(E). Appellate decisions, over the years, have given considerable gloss to the dual requirements that there be evidence that a felony was committed and "probable cause" to believe that the defendant committed that felony. See, e.g., *People v Doss,* 406 Mich 90, 100-101; 276 NW2d 9 (1979); *People v Asta,* 337 Mich 590, 609-610; 60 NW2d 472 (1953). In *People v Justice (After Remand),* 454 Mich 334, 344; 562 NW2d 652 (1997), quoting *Coleman v Burnett,* 155 US App DC 302, 316-317; 477 F2d 1187 (1973), the Michigan Supreme Court remarked that

> "[i]t is the contrast of probable cause and proof beyond a reasonable doubt that inevitably makes for examinatorial differences between the preliminary hearing and the trial. Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. Proof beyond a reasonable doubt, on the other hand, connotes evidence strong enough to create an abiding conviction of guilt to a moral certainty. The gap between these two concepts is broad. *A magistrate may become satisfied about*

*probable cause on much less than he would need to be convinced. Since he does not sit to pass on guilt or innocence, he could legitimately find probable cause while personally entertaining some reservations.* By the same token, a showing of probable cause may stop considerably short of proof beyond a reasonable doubt, and evidence that leaves some doubt may yet demonstrate probable cause." [Emphasis added in *Justice.*]

It is clear from these decisions, especially *Asta* and *Doss*, that the magistrate is *not* required to find that the evidence at the time of the preliminary examination proves the defendant's guilt beyond a reasonable doubt in order to bind the defendant over for trial on the charge.

Despite this rather low level of proof, the magistrate must always find that there is "evidence regarding each element of the crime charged or evidence from which the elements may be inferred" in order to bind over a defendant. *People v Selwa*, 214 Mich App 451, 457; 543 NW2d 321 (1995). If the evidence introduced at the preliminary examination conflicts or raises a reasonable doubt about the defendant's guilt, the magistrate must let the factfinder at trial resolve those questions of fact. This requires binding the defendant over for trial. *People v Hill*, 433 Mich 464, 469; 446 NW2d 140 (1989). In other words, the magistrate may not weigh the evidence to determine the likelihood of conviction, but must restrict his or her attention to whether there is evidence regarding each of the elements of the offense, *People v Coons*, 158 Mich App 735, 738; 405 NW2d 153 (1987),  after examining the whole matter, *People v King*, 412 Mich 145, 154; 312 NW2d 629 (1981). The evidence that factors into the magistrate's decision may be direct or circumstantial, *People ·v Terry*, 224 Mich App 447, 451;

569 NW2d 641 (1997), and it meets the "probable cause" standard when, "by a reasonable ground of suspicion, [it is] supported by circumstances sufficiently strong to warrant a cautious person in the belief that the accused is guilty of the offense charged," *People v Woods*, 200 Mich App 283, 288; 504 NW2d 24 (1993).

### VI. ELEMENTS OF THE OFFENSE

The vulnerable adult abuse statute provides that a

caregiver or other person with authority over the vulnerable adult is guilty of vulnerable adult abuse in the second degree if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes serious physical harm or serious mental harm to a vulnerable adult. [MCL 750.145n(2); MSA 28.342A(n)(2).]

To prove this crime, the prosecutor had to introduce evidence at the preliminary examination that established probable cause to believe

(1) that the defendant [was] a caregiver or other person with authority over the vulnerable adult, (2) that the victim [was] a vulnerable adult, (3) that the defendant engaged in a reckless act or reckless failure to act, and (4) that the reckless act or reckless failure to act caused serious physical harm or serious mental harm to a vulnerable adult. [*People v DeKorte*, 233 Mich App 564, 567; 593 NW2d 203 (1999).]

A reckless act or reckless failure to act is conduct that demonstrates a "deliberate disregard of the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm." MCL 750.145m(p); MSA

28.342A(m)(p). The statute does not define the term "deliberate disregard." However, the text surrounding the term in the statute suggests that "deliberate disregard" is a conscious decision to ignore the risk of harm that would flow from acting or failing to act, i.e., the reckless conduct.

### VII. SUFFICIENCY OF THE EVIDENCE

#### A. ELEMENTS NOT IN DISPUTE

Hudson does not contest that under the statute she was a "caregiver," that Parle was a "vulnerable adult," or that Parle's hip fracture was a "serious physical harm." See MCL 750.145m(c),  (r), and (u); MSA 28.342A(m)(c), (r), and (u). Thus, elements one, two, and part of element four are not in dispute. We examine the record to determine if there was evidence supporting probable cause to believe that Hudson engaged in a reckless act or failure to act and, if she did, whether that reckless act or failure to act *caused* Parle's injury. *DeKorte, supra.*

#### B. PARLE'S ABILITY TO WALK

At the preliminary examination, the prosecutor introduced Parle's care plan and the nursing notes in her record into evidence. Both indicated that Parle needed supervision, was at risk for falls, and had an unsteady gate. Pamela Lowe,[6] a nurse at the Greenery, testified that Parle took the drug Haldol to reduce the symptoms of her mental disorders, which could have affected her physical stability. Greenery

---

[6] Lowe was granted immunity in the matter on September 30, 1998.

staff also asked Parle's guardian, Michael O'Connell, to purchase sturdier athletic-style shoes for her to improve her walking, and he did.[7] Despite Parle's need for these shoes to enhance her stability, she was only wearing slippers at the time she fell. We, however, agree with Hudson that releasing Parle from the restraints was not reckless merely because Parle was wearing slippers. Nursing notes indicated that Parle walked around the facility independently and without falling thirty-six out of thirty-eight times over the 2½-month period preceding this accident. Schuler even testified that these walks were without staff assistance, that she generally observed that Parle was able to walk steadily, and that Parle walked without any problems on the night of the accident. Not even a broad view of the medical records suggests that Parle should have been prevented from walking in her slippers. Parle's "interdisciplinary care plan" even states that "slippers" were "preventative devices" for her.

More importantly, there is no evidence whatsoever that these slippers caused Parle to fall. The evidence at the preliminary examination does not explain whether muscle weakness, dizziness, the slippers, or *any* other factor caused Parle to fall. If, for example, Parle fell because her medication made her dizzy, then she would have fallen no matter what she was wearing on her feet. The prosecutor did not introduce even circumstantial evidence, such as a skid mark on the floor made by Parle's slippers or testimony from a

---

[7] The prosecutor contends that Hudson, herself, asked O'Connell to provide "tennis shoes" for Parle. The signature at the bottom of the record noting this request is largely unreadable, but the writing in the record does not appear to be in Hudson's tight, slanted script. The second record that notes the request for shoes from O'Connell is not signed and, like the other record, does not appear to be in her handwriting.

witness that night who might have seen Parle struggling to walk in the slippers, that would tend to show that the slippers played any role in her fall. Thus, even if releasing Parle from her restraints was reckless because she was wearing slippers, there is no evidence that that reckless act was causally connected to her injury.

### C. PARLE'S DISORIENTATION AFTER RESTRAINT

Nor was the evidence that Hudson knew that Parle had a pattern of disorientation and agitation when released from restraints sufficient to give a rational factfinder probable cause to believe that Hudson deliberately disregarded any knowledge that *releasing* Parle from the restraints would be injurious *to Parle*. Notes in Parle's record from August and September 1995 bearing Hudson's signature indicate that, when released from restraints, Parle would become "obsessive" about her "surroundings," "extremely agitated," and "beligerent [sic] to staff & others." The notes do not, however, document any injury *to Parle* when Greenery staff released her from restraints, much less that she had a tendency to fall at that time. Rather, the evidence tended to show that Parle would injure herself in the attempt to *escape* from restraints. When staff released Parle from restraints, she acted harmfully *toward others*, but did not have a pattern of injuring herself. Even viewing Hudson's conduct from a more distant and objective perspective, releasing a patient from restraints is not a reckless act in and of itself. No reasonable person would have probable cause to believe that it was necessarily reckless to engage in that conduct with Parle. As a result, it is impossible to conclude on these facts that the *"natu-*

*ral tendency"* of releasing Parle from her restraints was to cause her physical or mental harm. MCL 750.145m(p); MSA 28.342A(m)(p).

### D. PARLE'S NEED FOR SUPERVISION

The prosecutor also contends that Parle's documented need for supervision and the lack of supervision in the Greenery when Hudson released her suggested that the act of releasing her was reckless. Yet the record is silent regarding whether, despite the low staffing levels, the Greenery staff were available to supervise Parle after Hudson released her from the geri-chair. The prosecutor merely speculates that no one was supervising Parle even though there were other staff members in and around the area where Parle was sitting in the geri-chair, which was near the nurses' station.

Further, Parle did not need supervision constantly. She needed supervision only as a substitute for restraints and then only when she chose to wander through the facility. There is nothing in the record to indicate that when Hudson released Parle from her restraints she needed supervision. Parle could have been asleep when Hudson released her or she could have been calm and not a threat to herself or others, in which case supervision would have been unnecessary. Indeed, Parle's medical record indicates that she could be loud when agitated and needed to be restrained or supervised, yet Schuler, who was in the same part of the building where she restrained Parle, never heard Parle make any noise on the night she fell. Without any evidence suggesting inadequate supervision of Parle, we are uncertain how the district court could have concluded that lack of supervi-

sion made Hudson's act of releasing Parle from her restraints reckless or in deliberate disregard for her need for supervision.

### E. CAUSATION

We are also troubled by the lack of evidence showing that Hudson's act of releasing Parle from her restraints, even assuming that was reckless, actually caused Parle to fall. See *People v Tims*, 449 Mich 83, 95-97; 534 NW2d 675 (1995). In *People v Zak*, 184 Mich App 1; 457 NW2d 59 (1990), in which the prosecutor charged defendant Zak with involuntary manslaughter for selling a gun to Gene Anderson, who used the gun to kill Richard Solo, this Court looked at what proof of causation is necessary to show that a defendant is criminally responsible for involuntary manslaughter.[8] The *Zak* Court, citing Dressler, Understanding Criminal Law, § 14.02, pp 158-159, extensively explained that the prosecutor had the burden

---

[8] Quoting *People v Sealy*, 136 Mich App 168, 172-173; 356 NW2d 614 (1984), the *Zak* Court outlined the elements of gross negligence, which is itself an element of involuntary manslaughter:

> " '1. Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.
> " '2. Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand.
> " '3. The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.' " *People v Orr*, 243 Mich 300, 307; 220 NW2d [sic] 777 (1928); CJI 16:4:08. [*Zak, supra* at 7.]

We take special note that this third element, the failure to use care and diligence to avoid harm when it is obvious that care and diligence are necessary, bears a striking similarity to the "deliberate disregard" element in the vulnerable adult abuse statute, MCL 750.145m(p); MSA 28.342A(m)(p).

of proving that the defendant *actually caused* the killing.[9] *Zak, supra* at 9-14. To establish actual causation, the prosecutor had to prove that "but for" Zak's act of selling the gun to Anderson, Solo would not have been shot and killed. *Id.* at 9-10.

Although the Court took notice that, logically, Anderson had to obtain a gun before he could shoot and kill Solo, the Court concluded that Zak's act of selling the gun to Anderson was not an act sufficiently tied to the shooting to support a conclusion that Zak caused Solo's death by shooting. *Id.* at 10. The Court's decision made clear that not every act or omission leading up to an injury or social harm is its cause. *Id.* Rather, "common sense" dictates that some precursors to an injury or social harm are merely "conditions" and not causes.[10] " '*Conditions* are normal events or circumstances that, although necessary for the result to occur, do not positively contribute to it.' " *Id.* at 11, quoting Dressler at 159. Zak's act of selling the gun to Anderson was just such a condition.

Here, the prosecutor had the burden of producing evidence at the preliminary examination that could

---

[9] A prosecutor must also prove that the defendant proximately caused the killing. *Zak, supra* at 11-14. Much of the prosecutor's arguments and the evidence in this case would be relevant to proximate causation, the foreseeable or legal cause of a death, such as records showing that Parle had fallen in the past. See *Tims, supra* at 95-97. However, proximate cause is irrelevant if the prosecutor cannot show that Hudson's conduct contributed to Parle's fall.

[10] The *Zak* Court, relying on Dressler, *supra*, gave a good example of the necessary but attenuated relationship a "condition" has with an injury or social harm. Put simply, in order for a person to be killed unlawfully, the person must be born. *Id.* at 10-11. Yet, it defies legal reasoning to say that a homicide victim's mother should be held criminally responsible for her child's death simply because she gave birth to the child. If there is a more direct correlation between Hudson's act and Parle's fall than in this example from Dressler, the record does not indicate what that connection is.

lead a reasonable person to believe that "but for" Hudson's act of releasing Parle from her restraints, Parle would not have fallen and injured herself. Certainly, had Hudson not released Parle from her restraints, it would have been unlikely, although not impossible given her previous successful escapes from restraints, that she would have fallen. However, the act of releasing Parle from her restraints does not demonstrate how or why she fell; i.e., it does not demonstrate the actual cause of the fall, much less a connection between Hudson and that cause. There is no evidence that the act of releasing a patient from restraints leads to any physical condition that could have caused Parle to fall; the release merely allowed her to walk and therefore to move around the facility. There is no evidence that Parle was in an emotional or physical state that would have made it apparent to Hudson that Parle was likely to fall if released. There is no evidence that Hudson released Parle in an area of the Greenery where there were obstacles on the floor that Parle was unlikely to see and avoid, which would tie the release to the accident. Despite the perilous condition of the floor where the Greenery's roof was leaking, any buckets, blankets, or towels were in another area of the Greenery, not where Parle fell. The record simply fails to explain the physical forces that led to Parle's fall. We may speculate almost without end that Parle may have fallen because she was tired, emotionally distressed, confused, dizzy, took a misstep, or that someone brushed past her in the hall making her lose her balance. The lack of *any* evidentiary support or connection between those theories and Hudson's act demonstrates that the evidence of

actual causation was insufficient to bind her over for trial.[11]

### VIII. CONCLUSION

We conclude that the district court abused its discretion in binding Hudson over for trial. There was no probable cause to believe that releasing Parle from restraints while Parle was wearing slippers and under the conditions present at the Greenery was reckless or causally connected to her fall. Accordingly, the circuit court erred in denying the motion to quash the bindover and dismiss the information.

Reversed.

---

[11] The prosecutor continues to argue that Hudson's failure to record her actions with regard to Parle is proof positive of her reckless conduct because it shows her consciousness of guilt. The prosecutor's argument stems, in large part, from his refusal to acknowledge that the district court found insufficient evidence that Hudson illegally altered a medical record. Regardless, Hudson's failure to note what happened with Parle, even if purposeful, only points out the large gaps in the record. That we do not know all the details surrounding the accident does not inescapably lead to the conclusion that Hudson must be hiding her reckless conduct. Nor does it excuse the prosecutor from providing evidence, whether direct or circumstantial, of that recklessness and its causal connection to Parle's injury.