PEOPLE v KIM
PEOPLE v FUQUA
PEOPLE v LERMAN
PEOPLE v VANDEVOORDE
PEOPLE v HUGHES
PEOPLE v THOMAS

Docket Nos. 222523, 222526, 222527, 222528, 222530, 222531. Submitted
February 7, 2001, at Lansing. Decided May 4, 2001, at 9:15 A.M.

Sung W. Kim and five other counterdemonstrators at a Ku Klux Klan
rally at the Ann Arbor City Hall were, following preliminary exami-
nations in the 15th District Court, bound over for trial in the Wash-
tenaw Circuit Court on charges of riot, MCL 752.541. After a tempo-
rary fence separating the KKK rally and the counterdemonstration
had been breached, the defendants allegedly stormed the city hall
and threw rocks and other projectiles, breaking windows and hit-
ting police officers stationed on a second-floor promenade, which
was closed to nonofficers. The circuit court, Donald E. Shelton, J.,
quashed the informations on motions by the defendants, ruling that
the district court had abused its discretion in binding the defen-
dants over for trial inasmuch as the police officers, at whom the
defendants allegedly directed violent acts, were not the public for
purposes of the riot statute, which provides that it is unlawful and
constitutes the crime of riot for five or more persons, acting in con-
cert, to wrongfully engage in violent conduct and thereby intention-
ally or recklessly cause or create a serious risk of causing public
terror or alarm. The prosecution appealed.

The Court of Appeals *held*:

1. Under the riot statute, a defendant causes public terror or
alarm any time a segment of the public is put in fear of injury
either to their persons or to their property. The statute also applies
to violent conduct that creates a serious risk of causing public
alarm. Thus, prohibited conduct includes violent acts that inten-
tionally alarm the public or show a conscious disregard of alarming
the public. Contrary to the circuit court's reasoning, whether police
officers are members of the public for purposes of the statute is
not the critical inquiry. The district court did not abuse its discre-
tion in binding the defendants over for trial. The prosecution

presented evidence that the defendants acted in concert with others to engage in violent conduct with at least a conscious disregard that their conduct created a serious risk of causing the public to be alarmed, including not only the police but also people inside the city hall, nonviolent protesters, or mere passersby. As a matter of law, the violent throwing of rocks and projectiles at police officers at a rally of this magnitude and the violent storming of an occupied government building clearly rise to the level of creating a serious risk of public alarm.

2. The riot statute is not unconstitutionally vague and overbroad. The meaning of the phrase "public terror or alarm" is sufficiently clear that people of average intelligence would not have to guess at its meaning or differ with respect to its application. Public terror or alarm would be caused any time a segment of the public is put in fear of injury either to their persons or to their property.

Reversed and remanded.

CRIMINAL LAW — RIOT.

The riot statute applies to violent conduct by five or more persons, acting in concert, that intentionally alarms the public or shows a conscious disregard of the risk of alarming the public; public terror or alarm is caused when a segment of the public is put in fear of injury either to their persons or to their property (MCL 752.541).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, and *David A. King*, Senior Assistant Prosecuting Attorney, for the people.

*Scheff & Washington, P.C.* (by *George B. Washington* and *Miranda K. S. Massie*), for the defendants.

Amicus Curiae:

*Mark P. Fancher* and *Sherrie P. Guess*, for National Conference of Black Lawyers.

Before: HOLBROOK, JR., P.J., and MCDONALD and SAAD, JJ.

SAAD, J. In these consolidated cases, the prosecutor appeals as of right the circuit court's order granting

defendants' motions to quash the informations. The prosecutor charged the six defendants with the crime of riot, MCL 752.541, arising out of their conduct during a demonstration in opposition to a Ku Klux Klan rally in Ann Arbor. The Michigan chapter of the National Conference of Black Lawyers (NCBL) filed an amicus curiae brief in support of defendants.

## I. FACTS AND PROCEEDINGS

On May 9, 1998, the Ku Klux Klan staged a rally at the Ann Arbor City Hall. To counter the rally, the city of Ann Arbor sponsored a gathering at a park a few blocks from the city hall and various organizations and citizens sponsored another rally in the public areas surrounding the city hall. Hundreds of people protested the KKK rally near the city hall building, many of whom lifted and pulled down temporary fences erected to keep the crowd from reaching the building, in which the KKK members were assembled. Police used pepper spray to prevent the crowd from advancing toward the building on the south side of the city hall.

Several protesters approached the northeast corner of the city hall, where police officers were stationed on a promenade on the second floor of the building. Some protesters threw rocks at the police and pulled down the portion of fencing near the stairs to the promenade. Numerous demonstrators, including defendants Adam H. Lerman, Philip J. Vandevoorde, Zachary R. Thomas, Jonathan M. Hughes, Michael R. Fuqua and Sung W. Kim, ran up the stairs toward the police, throwing asphalt rocks and other projectiles at the officers and at the city hall building. The rocks and other objects hit officers and broke approxi-

mately sixteen windows of the city hall building. Twice the protesters temporarily forced the police to retreat. Thereafter, however, the police returned with shields and sprayed the promenade area with tear gas, and the demonstrators dispersed.

The district court bound defendants over for trial following two separate preliminary examinations. District Judge Timothy P. Connors presided over the preliminary examination for defendants Hughes, Kim, and Lerman.[1] District Judge Elizabeth P. Hines presided over the preliminary examination for defendants Fuqua, Thomas, and Vandevoorde.[2] After Judges Connor and Hines bound defendants over for trial on riot charges, the cases were assigned to Washtenaw Circuit Judge Donald E. Shelton. Thereafter, defendants filed motions to quash the informations, arguing that the prosecutor "mischarged and overcharged" them and that the riot statute was unconstitutional both on its face and as applied in their cases.

On September 13, 1999, the circuit court issued an opinion and order quashing the informations. Judge Shelton concluded that, although throwing rocks may constitute violent conduct under the riot statute, the prosecutor failed to present evidence that "the defendant[s'] violent conduct caused, or created a serious risk of causing public terror and alarm" as required by MCL 752.541. Judge Shelton specifically ruled that the police were not the "public" within the meaning of the statute and observed that no members of the general public, other than the protesters themselves,

---

[1] The preliminary examination for Jessica Marley Curtin also occurred at the same time. However, she is not a party to this appeal.

[2] The preliminary examination also included Robin Alvarez and Thomas Doxey, Jr., who are not parties to this appeal.

were on the promenade and that no evidence showed that the general public saw the violent conduct or were alarmed or terrorized by that conduct.

## II. ANALYSIS[3]

### A. DISTRICT COURTS' BINDOVER DECISIONS

The district court bound defendants over for trial pursuant to § 1 of the riot statute, MCL 752.541, which provides:

---

[3] This Court recently set forth the applicable standard of review in *People v Hudson*, 241 Mich App 268, 276; 615 NW2d 784 (2000):

> We review for an abuse of discretion a district court's decision to bind over a defendant. *People v Hamblin*, 224 Mich App 87, 91; 568 NW2d 339 (1997). "The standard for reviewing a decision for an abuse of discretion is narrow; the result must have been so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias." *People v Torres (On Remand)*, 222 Mich App 411, 415; 564 NW2d 149 (1997). A circuit court's decision with respect to a motion to quash a bindover order is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. See, generally, *People v Reigle*, 223 Mich App 34, 36; 566 NW2d 21 (1997); *People v Neal*, 201 Mich App 650, 654; 506 NW2d 618 (1993). In other words, this Court reviews the circuit court's decision regarding the motion to quash a bindover only to the extent that it is consistent with the district court's exercise of discretion. The circuit court may only affirm a proper exercise of discretion and reverse an abuse of that discretion. Thus, in simple terms, we review the district court's original exercise of discretion.

Whether § 1 of the riot statute, MCL 752.541, applies to violence against police officers is a question of statutory construction. "We review questions of statutory construction de novo and we review bindover challenges, in general, to determine whether the district court abused its discretion in finding probable cause that the defendant committed the charged offense." *People v Brown*, 239 Mich App 735, 739; 610 NW2d 234 (2000) (citations omitted).

To bind a defendant over, "the magistrate must always find that there is 'evidence regarding each element of the crime charged or evidence from which the elements may be inferred' in order to bind over a defendant."

It is unlawful and constitutes the crime of riot for 5 or more persons, acting in concert, to wrongfully engage in violent conduct and thereby intentionally or recklessly cause or create a serious risk of causing public terror or alarm.

In granting defendants' motions to quash the informations, the circuit court opined:

The prosecution contention that the on-duty police were the "public" within the meaning of the statute is without merit. Such a construction would convert render [sic] every violent act committed by 5 or more people against a police officer into the crime of riot.

Here, the alleged rock-throwing acts of violence by defendants Doxey, Lerman, Vandevoorde, Thomas, Hughes, Kim and Fuqua occurred while the police were on the northeast section of the promenade of City Hall. The only persons initially present there during the rally were police and, intermittently, some maintenance workers bringing the police shields. Protestors [sic] then breached the fence leading up to the promenade and entered. There was no evidence at the preliminary examination [sic, examinations] that any members of the general public were present on, or had access to, the promenade area. There was no evidence that the general public observed the violent conduct of those

_Hudson, supra_ at 278, quoting _People v Selwa_, 214 Mich App 451, 457; 543 NW2d 321 (1995). Further,

[t]o bind a defendant over for trial, the magistrate must be satisfied that there is sufficient evidence that an offense has been committed and that there is probable cause to believe that the defendant committed it. The magistrate has the duty to pass judgment on the credibility of witnesses as well as the weight and competency of the evidence, but the magistrate should not engage in fact finding or discharge a defendant when the evidence raises a reasonable doubt regarding the defendant's guilt. The district court's inquiry is not limited to whether the prosecution has presented sufficient evidence on each element of the offense, but extends to whether probable cause exists after an examination of the entire matter based on legally admissible evidence. [_People v Crippen_, 242 Mich App 278, 282; 617 NW2d 760 (2000) (citations omitted).]

defendants or that any members of the general public were alarmed or terrorized by that conduct while it was happening. The Court finds that these defendants' conduct does not meet the requisite element of causing or creating a "serious risk of causing public terror or alarm."

Thus, the circuit court concluded that the district court abused its discretion in binding defendants over because, although defendants' actions constituted violent conduct under the statute, there was insufficient evidence that the conduct intentionally or recklessly caused or created a serious risk of causing public terror or alarm. The circuit court reasoned that, because the violent acts were directed at and witnessed by police, and because police officers are not "members of the public," defendants' violent acts could not cause public terror or alarm. Upon our review de novo of the record, we find that the district court did not abuse its discretion in finding sufficient evidence regarding this element and in binding defendants over for trial.

This Court has observed that a defendant causes public terror or alarm "any time a segment of the public is put in fear of injury either to their persons or their property." *People v Garcia*, 31 Mich App 447, 456; 187 NW2d 711 (1971). However, the statute also applies to violent conduct that creates a *serious risk of causing* public alarm. Thus, prohibited conduct includes violent acts that intentionally alarm the public or show a conscious disregard of the risk of alarming the public. Contrary to the circuit court's reasoning, whether police officers are members of the public for purposes of the statute is not the critical inquiry here. Were the police officers the only persons who testified that they were actually "put in fear of

injury," defendants' conduct would nonetheless create a *serious risk of causing* the public to be alarmed. Moreover, evidence regarding the "serious risk" element does not require the prosecutor to present testimony of uninvolved, lay witnesses who testify to a feeling of alarm or fear.

The prosecutor presented evidence that defendants acted in concert with others to engage in violent conduct. Further, evidence showed that defendants engaged in conduct with at least a conscious disregard that their conduct created a serious risk of causing the public to be alarmed, including not only the police but also people inside the city hall, nonviolent protesters, or mere passersby. Indeed, testimony indicated that city council members witnessed the conduct and that maintenance workers, University of Michigan security personnel, and "peacekeepers" were also in the vicinity of the rock throwing. Contrary to the circuit court's reasoning, evidence regarding the "serious risk" element does not require nonpolice witnesses to testify about feeling alarmed. Rather, conduct may indicate an intent to cause public alarm or a reckless disregard for whether a serious risk of public alarm will result. Furthermore, we find that, as a matter of law, the violent throwing of rocks and projectiles at police officers at a rally of this magnitude and the violent storming of an occupied government building clearly rise to the level of creating a serious risk of public alarm. See *In re Wagner*, 119 Cal App 3d 90; 173 Cal Rptr 766 (1981).

The riot statute does not require that the violent conduct at issue be directed toward the public at

large as the NCBL argues.[4] The fact that defendants injured police officers is of no consequence to the risk of inciting fear among other members of the public; because the violent acts occurred in a public area and around a public building, there was a risk of causing public alarm, especially because the violent conduct prevented the police from performing their protective function during the onslaught by defendants and other demonstrators.[5] We are not persuaded by defendants' arguments that the legislative history of the riot statute indicates that the crime of riot requires evidence that the violent acts causing terror be directed at the public at large. The historical authority cited by defendants does not support this contention and, furthermore, the language of the statute is clear and unambiguous: the statute does not say that the violent act must be *directed at* the public to *cause alarm among* the public. Nor does the stat-

---

[4] Similar to this case, *Garcia, supra,* concerned the safety of a police officer, rather than violence directed toward the public at large. This Court held that a defendant who was part of a group that hurled rocks at a police car can be bound over for causing public terror or alarm. The NCBL attempts to distinguish *Garcia,* arguing that, unlike this case, the rioters in *Garcia* hurled rocks at police while standing in a public street. The NCBL argues that the promenade was not a public area "because the public did not have access to the promenade where the rock-throwing occurred." This argument is without merit. As noted above, defendants threw rocks at and through the windows of a public building situated on public land. Certainly, evidence that demonstrators broke sixteen windows of an occupied building shows conduct that might place the building occupants in fear of harm. Further, even if passersby did not have access to the promenade itself, flying projectiles still presented a risk of causing public alarm in the surrounding areas, particularly because defendants, among others, tore down the protective fencing around the building.

[5] The policy objective of the riot statute, the protection of public safety, is particularly relevant where the violent conduct precludes law enforcement from protecting the public. Indeed, the risk of causing public alarm is greater when rioters attack police because the police can neither aid the citizenry nor quell further violence.

ute specify or exclude those at whom the violence must be directed to satisfy the statute; regardless of whether it is directed at a building, one resident, a group of gang members, or several police officers, the violent act merely must cause or create the risk of causing public alarm. If the Legislature intended the statute to exclude violent acts against certain members of society, it could have easily done so explicitly.

The evidence established that defendants acted in concert with several others to engage in violent conduct that caused or created a serious risk of causing public terror or alarm. Ample evidence also established probable cause that each defendant participated in the rush toward the police and in throwing projectiles. Thus, the prosecutor presented evidence that the crime of riot was committed and that defendants committed it, thus obligating the district court to bind defendants over on that charge and requiring the circuit court to affirm the district court rulings.

### B. CONSTITUTIONALITY OF THE RIOT STATUTE, § 1

Defendants also challenge the riot statute as unconstitutionally vague and overbroad. This Court upheld the constitutionality of § 1 of the riot statute in *Garcia, supra* at 456, ruling as follows:

> The above section defines the crime of "riot." It specifically states that a riot is five or more people, acting in concert, wrongfully engaging in violent conduct and who, thereby, intentionally or recklessly create a serious risk of causing public terror or alarm. Although defendant attacks almost every phrase in the statute, including what the statute means by the phrase "5 or more persons," this Court is of the opinion that only the phrase "causing public terror or alarm" can be subject to any misinterpretation.

"Public terror or alarm" would be caused any time a segment of the public is put in fear of injury either to their persons or their property. The phrase is sufficiently clear that men of average intelligence would not have to guess as to its meaning nor differ as to its application. We hold that Section 1 gives adequate guidance as to what constitutes the crime of "riot."

Defendants and the NCBL acknowledge the *Garcia* Court's holding, but argue that it has been superseded by *NAACP v Claiborne Hardware Co*, 458 US 886; 102 S Ct 3409; 73 L Ed 2d 1215 (1982). In *Claiborne Hardware*, a group of white merchants sustained damages during a civil rights boycott and brought a claim against participants and certain civil rights organizations, seeking injunctive relief and money damages. The United States Supreme Court held that the *nonviolent* elements of the boycott activities were entitled to protection under the First Amendment. *Id.* at 915. Thus, to the extent that the petitioners sought to bring about political, social, and economic change through the exercise of their First Amendment rights of speech, assembly, association, and petition, rather than through riot or revolution, their activities were constitutionally protected. *Id.*

Clearly, *Claiborne Hardware* did not supersede *Garcia*. Both *Garcia* and the present case involve violent conduct rising to the level of riot. Neither the First Amendment nor *Claiborne* offers protection to the defendants under these facts. See *Grayned v Rockford*, 408 US 104; 92 S Ct 2294; 33 L Ed 2d 222 (1972) (peaceful demonstrations in public places are protected by the First Amendment, although when they turn violent, demonstrations lose their protected quality as expression under the First Amendment).

For the same reasons, we do not find merit in the NCBL's argument that the riot statute may be used as a tool "to infringe on the First Amendment rights of people of African descent and other powerless minorities, and to otherwise serve as a tool for racial discrimination and political repression."

The circuit court's order granting defendants' motions to quash is reversed, the charges of riot are reinstated, and this matter is remanded with directions to the circuit court to proceed consistent with this opinion. We do not retain jurisdiction.