*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER PAUL SCHURR,

        Defendant-Appellant.

FOR PUBLICATION
January 25, 2024
9:10 a.m.

No. 365104
Kent Circuit Court
LC No. 22-010260-FC

Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

FEENEY, J.

Defendant was charged with second-degree murder, MCL 750.317, and was bound over for trial by the district court. Defendant moved in the circuit court to quash the information and dismiss the charge, which the circuit court denied. Thereafter, this Court granted defendant leave to appeal. We affirm.

## SYNOPSIS

It is uncontested that on April 4, 2022, defendant, then a Grand Rapids Police Officer on patrol, shot and killed Patrick Lyoya during a struggle while defendant was attempting to arrest Lyoya. Defendant had initiated a traffic stop. Lyoya did not cooperate with instructions to stay in the vehicle, did not produce a driver's license, attempted to escape defendant's efforts to take him into custody, and a physical struggle ensued. At one point, while holding onto Lyoya's sweater with his left hand, defendant drew his Taser; Lyoya deflected it with his left hand and grabbed the Taser's barrel. The men wrestled while remaining on their feet during which the Taser discharged twice, neither time hitting Lyoya. The two struggled over control of the Taser and ended up on the ground with Lyoya face down on his hands and knees and defendant on top of his back. Defendant was unsuccessful in getting Lyoya to let go of the Taser. While still on Lyoya's back, defendant drew his service weapon and fired a single shot to the back of Lyoya's head, killing Lyoya.

## THE PRELIMINARY EXAMINATION

The preliminary examination was held on October 27 and 28, 2022, with several witnesses testifying and the examining magistrate rendering his decision on October 31, 2022. Also

presented were videos of the event, which included defendant's body cam video,[1] the dash cam video from defendant's patrol car, as well as a cell-phone video recorded by Lyoya's passenger.

The passenger, Aime Tuyishme, testified that he and Lyoya were unaware that defendant had initiated a traffic stop. Rather, according to Tuyishme, Lyoya had pulled over because of a noise coming from the car. In any event, the dash cam video shows that defendant began following Lyoya at about 8:11 a.m. on the morning of April 4, 2022. He activated his lights and followed Lyoya for two turns. After his second turn, Lyoya drove northbound on Nelson Avenue. He pulled over a few houses north of Griggs Street.

The dash cam and body cam videos show that Lyoya opened the door to his car and exited. Defendant opened his door and ordered Lyoya to remain inside. After Lyoya got fully out, defendant approached Lyoya and ordered him to get back inside the car. Lyoya responded, "What did I do?" Defendant informed Lyoya that he was stopping him. Lyoya stated, "For what?" Lyoya looked confused, and his eyes appeared glassy. Defendant told Lyoya that he stopped him because the plate on his car did not match the car for which it was issued. Defendant asked for Lyoya's driver's license and Lyoya opened the driver side door and asked Tuyishme to retrieve it. Tuyishme could not find it and told Lyoya. Lyoya closed the door and then began going "back and forth" with defendant.

After closing the driver's door, Lyoya started to walk around the front of the car. Defendant stated "no . . . no . . ." and reached for Lyoya. He ordered Lyoya to put his hands behind his back. Defendant grabbed both of Lyoya's arms and held him. Lyoya twisted away and broke free. Lyoya then ran toward defendant's car, turned left up a driveway apron, then turned left again and began running down the sidewalk. Defendant pursued him, called in that he had a "runner", and tackled Lyoya in the front yard of a nearby home

After struggling on the grass, Lyoya forced himself back to his hands and knees with defendant still on top. Lyoya got to his feet, and defendant struggled with him as Lyoya walked away. Defendant again ordered Lyoya to put his arms behind his back. Lyoya responded, "Okay," but continued to walk away. Defendant radioed for help with one hand on his radio and the other on Lyoya.

Defendant appeared winded as the two men stood in the yard. Defendant still had Lyoya's arms from behind. Lyoya also appeared tired. Lyoya yelled to Tuyishme to get the keys. Defendant commanded Lyoya to stop. Lyoya again responded, "Okay." Both men stood. Lyoya again asked Tuyishme to get the keys.

Lyoya then turned to face defendant. Defendant had his left hand grasping Lyoya's sweater as he pulled out his Taser with his right hand. Lyoya saw the Taser and reached for it with his left hand to push the Taser away from himself. Defendant deployed the first cartridge as Lyoya deflected his aim. Lyoya grabbed the Taser and turned away from defendant while defendant held

---

[1] Defendant's body cam stopped recording during the struggle due to the contact between the camera and Lyoya's body.

-2-

onto the Taser. Defendant ordered Lyoya to let go of the Taser. Lyoya asked, "What's your problem?" Defendant again ordered Lyoya to let go of the Taser.

Lyoya twisted away while grabbing the Taser. Lyoya dropped to one knee and defendant fell on top of him. Both men struggled over the Taser, and defendant again ordered Lyoya to let go of it. The Taser's second cartridge fired directly into the grass as defendant and Lyoya struggled over it. Defendant was fully on top of Lyoya's back as Lyoya ended up face down in the grass. Defendant again yelled, "Let go of the Taser!" Lyoya began to again force himself up. Defendant had his left arm wrapped around Lyoya's shoulder as he used his other hand to grab his service weapon. Defendant pulled out his pistol and pointed it at Lyoya. Defendant tried to push Lyoya down with his left hand as he fired the pistol into the back of Lyoya's head. Lyoya instantly went limp. Defendant called in the officer-involved shooting about 22 seconds later, and the first additional officer arrived about 39 seconds after defendant's call.

At the preliminary hearing, the defense called Robert McFarlane to testify as a forensic video analyst. He created a synchronized video from defendant's body camera, the police car dash camera, and the bystander video of the events at issue. McFarlane also explained that the dash cameras in the police cars record video all the time, but not sound. When activated, the camera will "reach back" and grab 30 seconds of video and begin recording sound.[2] For that reason, the first 30 seconds of video has no sound. McFarlane stated that he reviewed the videos and heard defendant give Lyoya 20 commands within the two-minute incident.

Captain Chad McKersie of the Grand Rapids Police Department testified that, as part of his duties with the department, he trained officers on the proper use of Tasers. He trained them that the Taser was a dangerous weapon because it could cause death or serious injury. Captain McKersie reviewed the video and believed that defendant could be seen working through the "available use of force techniques" and "responses". He agreed that Lyoya was resisting arrest, which was a felony. In his opinion, Lyoya had moved from passive resistance to active resistance. He explained that Lyoya could be seen "throwing" his elbows—but could not opine whether Lyoya was either trying to break defendant's grasp or to assault defendant. Lyoya then disarmed defendant when he grabbed the Taser. According to Captain McKersie, Lyoya's resistance was an inherently dangerous felony, and it could be seen in the videos that defendant was "spent." Captain McKersie opined that it was reasonable for defendant to use deadly force. He felt that Lyoya had a weight advantage over defendant. He stated that defendant was outnumbered despite Lyoya's friend remaining at or in the vehicle, Lyoya disarmed defendant by grabbing the Taser, and no backup had arrived by the time defendant discharged his service weapon. Additionally, Captain McKersie believed, based on the video evidence, that defendant was exhausted, and, once exhausted, one's skillset diminishes. Captain McKersie opined as well that the Taser was still dangerous even though both cartridges had been fired.

In closing, the prosecution asked that the district court bind over defendant to the circuit court for trial on second-degree murder. He argued that the only element at issue was whether defendant was justified in shooting Lyoya. The prosecution pointed to a defense still image that captured the moment when the shell casing ejected from defendant's weapon and asked whether

---

[2] The sound on the video does begin before defendant made contact with Lyoya.

that was necessary to prevent Lyoya's escape at that very moment. He noted that at that moment, Lyoya was face down on the ground and the Taser was under Lyoya's body and not pointing at defendant who was on Lyoya's back. He noted that the medical examiner testified that the bullet went into the back of Lyoya's head and traveled back-to-front in an upward trajectory—upward because Lyoya's face was down on the ground. The prosecutor opined that it was not the district court's call to decide whether the shooting was necessary; it was for the jury.

The defense argued that the immediately necessary standard was not the proper standard. The defense maintained that an officer can resort to deadly force anytime someone resists arrest. The question, in his opinion, was whether there was evidence that defendant had probable cause to believe that Lyoya committed a felony. And once one answers that question in the affirmative, defendant had an absolute right to use deadly force if Lyoya resisted. Because it was undisputed that Lyoya resisted, defendant asserts that he had—as a matter of law—the right to use deadly force. Accordingly, the district court had to deny the bindover. On rebuttal, the prosecution noted that the defense seemed to say that it was the law in Michigan that, "if somebody uses force to resist arrest, you know, all bets are off." The prosecution argued that was not the law in Michigan.

THE DISTRICT COURT'S BIND OVER RULING

The district court read its written opinion into the record on October 31, 2022. After summarizing the evidence presented, the district court noted that it had limited authority to interfere with the prosecutor's decision:

> A court can only determine whether the charge is founded upon probable cause. If it is legally sound, the Court cannot stand in the way of the criminal prosecution regardless of what the court might think about the prosecutor's decision to bring charges or even the likelihood of conviction by a jury. In other words, the limited question for this Court is whether the criminal prosecution can continue as a matter of law without any regard for whether the criminal prosecution should proceed based on anything other than the law.

The district court acknowledged that the elements of second degree murder were "(1) a death, (2) caused by an act of the defendant, (3) with malice, (4) without justification or excuse." It found there was no real dispute about the first three elements because it was undisputed that Lyoya died of a gunshot wound to the head and the video evidence showed defendant pointing his weapon at Lyoya's head and firing it at close range, which satisfied the element of malice. The only debatable question, the court stated, was "whether defendant's actions were justified under the law." The district court explained that the standard it must apply was whether there was evidence from which a person of ordinary prudence and caution might entertain a reasonable belief that defendant was not justified in killing Lyoya.

> Defendant presents three theories that he argues establishes clear justification as a matter of law such that no probable cause exists for bind over: (1) that he used force reasonably necessary in defense of himself or others; (2) that he used appropriate force in response to force used by Lyoya to avoid arrest; and (3) that he used reasonable force to prevent a felon from fleeing to avoid capture.

-4-

As for self-defense, the district court found there was evidence from which a jury might conclude that defendant did not have a reasonable belief that he was in danger of suffering death or serious bodily injury. Although the district court opined that there was strong evidence showing defendant acted reasonably, there were factual questions about whether defendant knew that the Taser had fired both cartridges and whether he had alternate avenues available to him:

> While modified by statute in certain respects in recent years, Michigan law governing self-defense remains primarily a creature of common law. See *People v Conyer*, 281 Mich App 526, 529; 762 NW2d 198 (2008); MCL 780.951, et. seq.; MCL 780.971, et. seq. . . . The ultimate question requires a factual determination of whether "the accused, under all circumstances of the assault, as it appeared to him, honestly believe that he was in danger of [losing] his life, or great bodily harm, and that it was necessary to do what he did in order to save himself from such apparent threatened danger." [*People v*] *Riddle*, 467 Mich [116,] 127; [649 NW2d 30 (2002)], quoting *People v Lennon*, 71 Mich 298, 300-301; 38 NW 871 (1888).

> Thus, the homicide of Patrick Lyoya would be justified under the law of self-defense "only if the defendant honestly and reasonably believe[d] his life [was] in imminent danger or that there [was] a threat of serious bodily harm and that it was necessary to exercise deadly force to prevent such harm to himself. Our Supreme Court made it clear that "the touchstone of any claim of self-defense, as a justification for homicide, is necessity." *And, indeed, the Court confirmed that generally questions concerning the existence or lack of reasonableness or necessity in resorting to deadly force in self-defense are for the jury to decide after considering all the circumstances.* [Emphasis added]

Accordingly, the district court found there was evidence from which a reasonable jury could conclude that self-defense did not justify defendant's actions[3].

---

[3] The district court quoted from M Crim JI 7.15, Use of Deadly Force in Self-Defense to reiterate that the jury instructions recognize the jury's role in determining reasonableness and necessity:

"Defendant must have been afraid of death or serious physical injury. When you decide if the defendant was afraid of one or more of these, you should consider all the circumstances: the condition of the people involved, including their relative strength, whether the other person was armed with a dangerous weapon or had some other means of injuring the defendant, the nature of the other person's attack or threat, whether the defendant knew about any previous violent acts or threats made by the other person. And at the time, the defendant must have honestly and reasonably believed that what he did was immediately necessary. Under the law, a person may only use as much force as he thinks is necessary at the time to protect himself. And when you decide whether the amount of force used seemed to be necessary, you may consider whether the defendant knew about any other ways of protecting himself, but you may also consider how the excitement of the moment affected the choice the defendant made."

The district court noted that Captain McKersie was unclear whether Lyoya was trying to get away from defendant versus offensively attacking defendant; McKersie also testified to other alternative techniques defendant could have used and whether the Taser presented a different threat or danger depending on whether both the Taser's cartridges were discharged or the Taser was in drive-stun mode. In concluding there was sufficient evidence that a jury could conclude that defendant did not reasonably believe his life was immediately at risk "or the use of deadly force in the manner it was used by defendant was not reasonably necessary," the district court observed:

> The Court does not raise these examples to suggest that defendant's actions exceeded what was reasonably necessary. . . . The law recognizes that law enforcement officers are required to make split-second decisions of life and death which cannot be judged through 20/20 vision of hindsight from the vantage point of the judges' bench. See *Graham v Connor*, 490 US 386, 396 (1989). It is precisely for this reason that defendant must be bound over for trial to allow a jury to make that factual determination taking into account all of the evidence produced at a full and fair trial.

The district court also determined that the right to meet force with force was not a separate form of justification but was instead analyzed under the law applicable to self-defense.

> Defendant's remaining two theories of justification concern the use of force in making an arrest of a suspected criminal. Defendant points out that the defense in that context can be divided into two categories: (1) the use of deadly force when a person making the arrest is met with force from the person arrested, and (2) the use of deadly force when necessary to prevent the person who is to be arrested from fleeing. *People v Whitty*, 96 Mich App 403, 411; 292 NW2d 214 (1980).
>
> The first category, however, is not a distinct theory of justification from that of self-defense. *Whitty*, 96 Mich App at 411. Rather, it is sometimes highlighted as its own theory because it always excuses any obligation to retreat. *Id.*, citing *State v Dunning*, 177 NC 559; 98 SE 530 (1919); Perkins & Boyce, Criminal Law (3rd ed.), p. 1097. Our Supreme Court has explained:
>
> 'The officer has discretion, within reasonable limits, to determine the amount of force which the circumstances require, and he is not guilty of wrong unless he arbitrarily abuses the power confided in him.' Likewise, police officers making a lawful arrest may use that force which is reasonable under the circumstances in self-defense, and unlike the provate citizen a police officer, by the necessity of his duties, is not required to retreat before a display of force by his adversary. See 40 Am Jur 2d, Homicide, s 137, pp. 427-428. *However, like the private citizen, the police officer who claims self-defense must have reasonably believed himself to have been in great danger and that his response was necessary to save himself therefrom.* [*People v Doss*, 406 Mich 90, 103; 276 NW2d 9 (1979) (emphasis in original; footnotes omitted).]'

Therefore, for the purposes of this case, this theory is completely duplicative of, and indistinct from, the justification theory of self-defense.

And because the district court found some evidence whereby the jury could conclude defendant's belief was not reasonable or his response was not reasonably necessary, the theory regarding the use of force when met with force also did not prevent a bindover.

Finally, the district court addressed whether defendant had an absolute right to use deadly force to stop a fleeing felon. The district court determined that the justification was not absolute; it required proof that the use of deadly force was necessary to ensure apprehension. The district court relied on *People v Couch*, 436 Mich 414, 431-432; 461 NW2d 683 (1990), in holding that "the common law fleeing felon defense, as it existed in 1846 at the time that the crimes of murder and manslaughter were codified in this state's first Penal Code, continues to be the governing law of this state." Based upon *Couch*, the district court found that the use of deadly force is justified if: "(1) evidence shows that a felony actually occurred, (2) the fleeing suspect against whom force was used was the person who committed the felony, and (3) the use of deadly force was necessary to ensure the apprehension of the felon." Under "this broad and rather forgiving rule of justification, the question of 'necessity' remains tightly wound around its core: requiring an answer to the question of whether the use of deadly force was 'necessary to ensure the apprehension of the felon,'" which, according to the district court, was "no different than the 'necessity' component at the core of self-defense, 'necessity to ensure the apprehension of the felon' is a question of fact for the jury to decide."

The court did note that Lyoya was not actively fleeing or escaping when he was shot in the back of the head. And some evidence existed where a person of average intelligence could find lack of necessity for using deadly force to prevent escape, so the jury needed to decide whether the use of deadly force was necessary to apprehend Lyoya. Accordingly, the district court found that probably cause was presented to support the charge in the criminal complaint and bound defendant over to circuit court.

The prosecution subsequently submitted an amended information charging defendant with second-degree murder in November 2022. In January 2023, defendant moved to quash the bindover to the circuit court. Defendant argued that the only element at issue in the preliminary examination was whether he was justified; because the district court misapplied the law, defendant should not have been bound over. The circuit court denied the motion to quash.

STANDARD OF REVIEW

-7-

This Court in *People v Hudson*, 241 Mich App 268, 276-277; 615 NW2d 784 (2000), clearly set forth the standard of review applicable to reviewing a circuit court's decision granting or denying a motion to quash a bindover and dismiss the charges:[4]

> We review for an abuse of discretion a district court's decision to bind over a defendant. *People v Hamblin*, 224 Mich App 87, 91; 568 NW2d 339 (1997). "The standard for reviewing a decision for an abuse of discretion is narrow; the result must have been so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias." *People v Torres (On Remand)*, 222 Mich App 411, 415; 564 NW2d 149 (1997). A circuit court's decision with respect to a motion to quash a bindover order is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. See, generally, *People v Reigle*, 223 Mich App 34, 36; 566 NW2d 21 (1997); *People v*

---

[4] We note that there appears to be some confusion regarding the standard of review with respect to the circuit court's decision on a motion to quash. In his brief, defendant cites *People v Seewald*, 499 Mich 111; 879 NW2d 237 (2016), for the proposition that both the district court and circuit court decisions on the bindover are reviewed for an abuse of discretion. *Seewald* did not so hold. We are aware that there is at least one line of cases that do state that both the district court's bindover decision and the circuit court's ruling on the motion to quash are reviewed for an abuse of discretion. See *People v Simon*, 339 Mich App 568, 580; 964 NW2d 800 (2021), quoting *People v Bass*, 317 Mich App 241, 279; 893 NW2d 140 (2016). *Bass*, in turn, made the same statement, quoting *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011). *Dowdy*, without analysis, repeated that same standard of review, relying on this Court's decision in *People v Hamblin*, 224 Mich App 87, 91; 568 NW2d 339 (1997). The *Hamblin* Court looked to *People v Thomas*, 438 Mich 448, 452; 475 NW2d 288 (1991), and *People v Honeyman*, 215 Mich App 687, 691; 546 NW2d 719 (1996). *Thomas* actually held that, because the basis for the motion to quash involved a question of law, the circuit court's decision was simply a review for error. As for *Honeyman*, it stated that this Court reviews the district court's decision and that in reviewing the circuit court's decision on the motion to quash, "this Court determines if the district court abused its discretion in binding over the defendant." *Honeyman* looked to this Court's decision in *People v Fiedler*, 194 Mich App 682, 692-693; 487 NW2d 831 (1992), which similarly stated that this Court's review of the circuit court's decision on a motion to quash is to determine whether the district abused its discretion. Thus, the binding rule is that stated in *Fiedler* and *Honeyman*, that this Court reviews the decision on a motion to quash to determine whether the district court abused its discretion in its bindover decision. The cases that followed in the line of decisions that both the District Court and the Circuit Court decision are reviewed for abuse of discretion are examples of jurisprudential drift, based on an initial misstatement of the law, which later courts blindly repeated without analysis, which therefore need not be followed. See *Tolas Oil & Gas Exploration Co v Bach Services & Manufacturing, LLC*, __ Mich App ___; ___ NW2d ___ (Docket No. 359090. rel'd 6/15/2023), slip op at 3 n 2. Accordingly, we rely upon the standard of review stated in *Hudson* as representing the accurate rule of law.

*Neal*, 201 Mich App 650, 654; 506 NW2d 618 (1993). In other words, this Court reviews the circuit court's decision regarding the motion to quash a bindover only to the extent that it is consistent with the district court's exercise of discretion. The circuit court may only affirm a proper exercise of discretion and reverse an abuse of that discretion. Thus, in simple terms, we review the district court's original exercise of discretion.

Because the question whether to dismiss the information is inextricably connected to whether the district court erred in binding over a defendant, a circuit court's decision not to dismiss the information may be reversed only if the district court abused its discretion in binding over the defendant. See *People v Honeyman*, 215 Mich App 687, 691; 546 NW2d 719 (1996).

The fact that defendant committed the actus reus of second-degree murder is not in dispute: he shot and killed Patrick Lyoya. Defendant's defense is that he was justified in doing so under three different doctrines: (1) self-defense, (2) use of force in making an arrest, and (3) the fleeing-felon doctrine. Additionally, defendant argues that the second-degree murder statute is unconstitutionally vague as applied in violation of his due process rights. Before turning to defendant's three justification arguments, we will briefly address an additional argument raised by defendant.

CONSTITUTIONALITY OF SECOND-DEGREE MURDER STATUTE

Defendant argues that the second-degree murder statute is unconstitutionally vague because it does not clearly delineate what is considered a justification for a killing. We disagree. "The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998).[5] Defendant focuses on a statement by the circuit court referring to the

---

[5] Defendant directs our attention to a recent decision of this Court which held that "without justification or excuse" is not an element of second-degree murder. See *People v Spears*, ___ Mich App ___; ___ NW2d ___ (No. 357848, rel'd 4/20/2022) (defendant refers to *Spears* for the proposition that even so, the prosecutor still bears the burden of disproving a justification defense). We question the correctness of *Spears* with regard to its conclusion that the absence of justification or excuse is not an element of second-degree murder. Part of its analysis is the claim that the numerous Supreme Court decisions that list it as an element trace back to a dissent by Justice Cavanagh in *People v Dykhouse*, 418 Mich 488, 509 n 13; 345 NW2d 150 (1984) (CAVANAGH, J., *dissenting*), rather than to a majority opinion. Justice Cavanagh's opinion itself cites to *People v Hansen*, 368 Mich 344, 350-351; 118 NW2d 422 (1962), which states that the malice element "requires also on the negative side the absence of any circumstances of justification, excuse or recognized mitigation." This is consistent with the use of the term "malice" in the common-law development of that term as it applies to homicide cases:

fourth element as being an "optional element." We are not persuaded that this is evidence of any vagueness in the second-degree murder statute. First, as discussed above, we are reviewing the district court's bindover decision, not the circuit court's decision to deny defendant's motion to quash and dismiss the charges. Second, the circuit court's comment concerning the Model Criminal Jury Instruction for second-degree murder; M Crim JI 16.5 states that the prosecutor must prove beyond a reasonable doubt "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime." But the Use Note directs that this portion of the instruction "may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter." Thus, it is not the element of justification or excuse that is optional, but the need to read that portion of the instruction if no justification or excuse defense is presented.

MCL 750.317 states that "[a]ll other kinds of murder shall be murder of the second-degree . . . ." That is to say, second-degree murder is any common-law murder that does not amount to first-degree murder. See *People v Dykhouse*, 418 Mich at 495. Defendant also argues that the statute is unconstitutionally vague because it does not put a defendant on notice as to what conduct would be excused or justified. Again, we disagree. The void-for-vagueness doctrine is based upon the principle that there is a denial of due process if the statute's prohibitions are not clearly defined. *People v Miller*, 326 Mich App 719, 738; 929 NW2d 821 (2019). But "[f]air notice exists when the statute's meaning can be determined by referring to judicial interpretations, common law, dictionaries, treatises, or the common meanings of words." *Id*. We acknowledge the defenses of

---

"Malice" is a legal term of art with little connection to its non-legal meaning. As the term has developed, a person who kills another acts with "malice" if she possesses any one of four states of mind . . . .

These disparate mental states have one feature in common: In the absence of justification (e.g., self-defense), excuse (e.g., insanity), or mitigating circumstances (e.g., adequate provocation), each mental state manifests the actor's extreme indifference to the value of human life. [Dressler, Understanding Criminal Law, (6th Ed), § 31.02[B][2], p 499.]

As will be discussed later, and which *Spears* acknowledges, slip op at 11, our murder statutes incorporate the common law as it existed in 1846. Therefore, malice cannot be established in the face of a justification defense.

Nevertheless, we need not resolve the correctness of *Spears* in this case. Both this Court and the Supreme Court has held that consideration of criminal defenses are to be considered at the preliminary examination. See *People v Redden*, 290 Mich App 65, 74; 799 NW2d 184 (2010) ("The district court must consider not only the weight and competency of the evidence, but also the credibility of the witnesses, and it may consider evidence in defense."). See also *People v King*, 412 Mich 145, 153-154; 312 NW2d 629 (1981) ("Although the prosecution has presented some evidence on each element, if upon an examination of the whole matter the evidence is insufficient to satisfy the magistrate that the offense charged has been committed and that there is probable cause to believe that the defendant committed it, then he should not bind the defendant over on the offense charged . . . .")

justification and excuse are well-established in the common law, the subject of innumerable court decisions and legal treatises. Accordingly, Michigan's murder statutes are not void for vagueness.

PRELIMINARY EXAMINATIONS

In our review of the district court's ruling's we recognize its role in the preliminary examination. A preliminary examination is a statutory right; there is no constitutional requirement that a defendant receive an adversarial hearing before being bound over for trial. See *People v Hall*, 435 Mich 599, 603; 460 NW2d 520 (1990). The Legislature provided that, after hearing all the evidence at the preliminary examination, the district court must either discharge the defendant, reduce the charge, or bind the defendant to appear before the circuit court:

> If the magistrate determines at the conclusion of the preliminary examination that a felony has not been committed or that there is not probable cause for charging the defendant with committing a felony, the magistrate shall either discharge the defendant or reduce the charge to an offense that is not a felony. If the magistrate determines at the conclusion of the preliminary examination that a felony has been committed and that there is probable cause for charging the defendant with committing a felony, the magistrate shall forthwith bind the defendant to appear within 14 days for arraignment before the circuit court of that county, or the magistrate may conduct the circuit court arraignment as provided by court rule. [MCL 766.13.]

Our Supreme Court has promulgated by court rule that the district court must determine both that there is probable cause to believe that the crime has been committed and probable cause to believe that the defendant committed the crime. See MCR 6.110(E) and (F). The court rule does not conflict with the statute; it clarifies the applicable burden of proof. See *People v Fiedler*, 194 Mich App 682, 689-692; 487 NW2d 831 (1992).

The prosecution bears the burden to present evidence establishing probable cause to believe that a felony was committed by a person and probable cause to believe that the defendant was that person. *People v Yost*, 468 Mich 122, 125-126; 659 NW2d 604 (2003). To that end, the prosecution must present "evidence from which at least an inference may be drawn establishing the elements of the crime charged . . . ." *Id.* at 126. The probable-cause standard of proof is less rigorous than the guilt-beyond-a-reasonable-doubt standard of proof. *Id.* The prosecution need only present evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *Id.* Accordingly, a magistrate need not be without doubt as to the defendant's guilt in order to bind him or her over to the circuit court because there is a broad gap between probable cause and guilt beyond a reasonable doubt and it is for the jury alone to decide the latter. *Id.*

A district court may not weigh the evidence to determine the likelihood of conviction. Instead, the district court must bind over the defendant for trial if the prosecution presents sufficient evidence, even if the evidence conflicts or raises a reasonable doubt about the defendant's guilt. See *Hudson*, 241 Mich App at 278-279. The district court has the duty to assess the credibility of witnesses and may properly disregard a witness's testimony when it could not possibly convince

a disinterested arbiter. *Yost*, 468 Mich at 127-128. The district court could also not bind over a defendant on a mere suspicion of guilt; there must be evidence to support a reasonable belief in the defendant's guilt. *Simon*, 339 Mich App at 585.

The parties agreed that the elements of second-degree murder were: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). The parties did not dispute that defendant killed Lyoya by shooting him in the back of the head at close range. They also did not dispute that the circumstances of the shooting met the malice element. *Id*. at 466-467 (discussing the ways in which the requisite malice may be proved). The parties only dispute whether the prosecution presented evidence that defendant acted without justification in killing Lyoya.

Typically, affirmative defenses, such as justification and self-defense, must be presented at trial. See *People v Redden*, 290 Mich App 65, 84; 799 NW2d 184 (2010). Indeed, the Legislature has put into place statutory limits on the assertion of certain defenses that apply after a person has been bound over on a felony charge. See MCL 768.20(1) (requiring notice of alibi defense); MCL 768.20a(1) (requiring notice of insanity defense and setting procedures that must be met to allow the assertion); MCL 768.21b(1) (requiring notice of defense of duress as a defense to breaking out of prison). These requirements ensure that the prosecution will have a fair opportunity to investigate and respond to the asserted defenses in an orderly manner. See, e.g., *People v Merritt*, 396 Mich 67, 85; 238 NW2d 31 (1976). Asserting such a defense at the preliminary examination stage would not seem to meet these goals. Nevertheless, our Supreme Court has stated that the inquiry at the preliminary examination is not "limited to whether the prosecution has presented evidence on each element of the offense." *People v King*, 412 Mich 145, 154; 312 NW2d 629 (1981). The *King* Court held that, because the district court could consider the whole matter, it properly considered the defendant's evidence of intoxication and provocation when determining whether to bind over the defendant to the circuit court. *Id*.; see also *People v Doss*, 406 Mich 90, 103; 276 NW2d 9 (1979) (concluding that the district court did not abuse its discretion when it bound over the defendant police officer for trial because the defendant did not establish as a matter of law that he was justified in killing the victim); MCL 780.961(2) (requiring the prosecution to present evidence at the preliminary examination that the defendant did not act in compliance with the self-defense act). Similarly, this Court has stated that, if the defendant presents evidence that he or she has a complete defense to the charge on the undisputed evidence, it would be improper for the district court to bind over the defendant. *Redden*, 290 Mich App at 84. Accordingly, the district court had the authority to consider defendant's defenses when determining whether to bind him over to the circuit court.

JUSTIFICATION DEFENSES:

1. USE OF FORCE IN MAKING ARREST

We now turn to legal defenses raised by defendant. We first consider defendant's argument that his use of deadly force was justified in order to effectuate the arrest and that the district court erred in concluding that the common-law rule in this respect "is completely duplicative of, and indistinct from, the justification theory of self-defense," and in binding defendant over because "there is some evidence from which a jury could conclude that defendant's belief was not reasonable or that his response was not reasonably necessary."

Defendant's argument on its face would suggest that whenever a police officer is met with force in making an arrest, the officer is always justified in using force, including deadly force, in order effectuate an arrest. We reject this blanket rule, concluding that use-of-force in making an arrest is more nuanced than defendant's brief suggests. We also conclude that defendant has not demonstrated that the district court misapplied the fleeing-felon rule or abused its discretion when it bound him over to the circuit court notwithstanding that he presented evidence that might support the application of that defense at trial.

The district court opined as follows:

> Defendant's remaining two theories of justification concern the use of force in making an arrest of a suspected criminal. Defendant points out that the defense in that context can be divided into two categories: (1) the use of deadly force when a person making the arrest is met with force from the person arrested, and (2) the use of deadly force when necessary to prevent the person who is to be arrested from fleeing. *People v Whitty*, 96 Mich App 403, 411; 292 NW2d 214 (1980).

> The first category, however, is not a distinct theory of justification from that of self-defense. *Whitty*, 96 Mich App at 411. Rather, it is sometimes highlighted as its own theory because it always excuses any obligation to retreat. *Id*. citing *State v Dunning*, 177 NC 559; 98 SE 530 (1919); Perkins & Boyce, Criminal Law (3d ed.), p. 1097.

> * * *

> Therefore, for the purposes of this case, this theory is completely duplicative, and indistinct from, the justification of self-defense.

> And for the same reasons discussed, for purposes of the probable cause standard, there is some evidence from which a jury could conclude that defendant's belief was not reasonable or that his response was not reasonably necessary. [Footnote omitted.]

## 2. DEADLY FORCE AND THE FLEEING FELON

Defendant first maintains that he had the absolute right to use deadly force to apprehend Lyoya under the common-law fleeing-felon rule once he presented evidence that Lyoya committed a felony in his presence and was fleeing arrest. Indeed, defendant argues that, because Lyoya was a felon, defendant as a police officer had the immediate right to resort to deadly force. Defendant argues that the district court and circuit court erred when they imposed a necessity requirement on the use of deadly force to apprehend a fleeing felon because the element of necessity does not apply to police officers. Defendant's claim that the necessity element does not apply to police officers is unsupported by the law.

Our Supreme Court first addressed the common-law fleeing-felon rule in *People v Gonsler*, 251 Mich 443; 232 NW 365 (1930). In that case, two brothers had been selling illicit moonshine from their garage. *Id*. at 444. Someone had broken into their garage and stolen moonshine, so the brothers set up an alarm system to alert them if there was another break in. *Id*. On the night at

issue, the defendant heard the alarm and shot the victim outside his garage. *Id*. The defendant asserted that he used deadly force to prevent the victim from escaping, but there was evidence tending to suggest that he shot the victim without warning and without the intent to arrest. *Id*. at 444-445.

On appeal, the defendant in *Gonsler* argued that the trial court should have directed a verdict in his favor because he established that he was justified in taking the victim's life in an effort to arrest him. *Id*. at 443. The Supreme Court disagreed and concluded that the trial court did not err when it submitted the matter to the jury with the following instruction:

> *Both officers and private persons* seeking to prevent a felon's escape must exercise reasonable care to prevent the escape of the felon without doing personal violence, and it is only where killing him is necessary to prevent his escape, that the killing is justified, and it is for you as jurors to determine from the evidence in this case the existence or absence of the necessity. If the killing is not justifiable, it is either murder or manslaughter. [*Id*. at 446-447 (quotation marks omitted; emphasis added).]

Although the decision in *Gonsler* involved a private citizen, our Supreme Court clearly expressed that the instruction at issue correctly summarized the common-law fleeing-felon rule. See *id*. The rule imposed a duty on both private persons and police officers to exercise reasonable care to avoid personal violence and provided that a killing would be justified under the law only when *necessary* to prevent escape. See *id*.

This Court also examined the proper elements of the fleeing-felon rule, as applied to a private citizen, in *People v Whitty*, 96 Mich App 403; 292 NW2d 214 (1980).[6] In *Whitty,* the defendant managed a store that had been robbed. *Id*. at 408. The defendant knew who robbed the store and went to the hotel where the suspect was staying. *Id*. He confronted the suspect and killed him. *Id*. at 408, 409. According to the defendant, he went to the hotel to arrest the suspect, but the suspect resisted. *Id*. at 409. The defendant claimed that he justifiably used deadly force either to arrest the suspect or in self-defense. *Id*. at 410. The jury did not accept the defendant's version of events and found him guilty of first-degree murder. *Id*. at 407.

On appeal, the defendant argued that the trial court did not properly instruct the jury on the use of deadly force in effecting a valid arrest. *Id*. at 410. This Court relied on foreign authorities to determine the proper scope of the common-law rule and recognized that, under the common law, *all* persons—both police officers and private citizens—had the right to use deadly force "when necessary to prevent the person who is to be arrested from fleeing." *Id*. at 410, 411. A police

---

[6] This Court is not required to follow a decision by this Court published before November 1, 1990. See MCR 7.215(J)(1). However, decisions published before November 1, 1990, pre-1990 decisions are not binding precedent on this count—only on the trial courts and only are precedent if uncontradicted and ought to be carefully considered. See MCR 7.215(C)(2); *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019), lv den 505 Mich 859 (2019). See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

officer was justified in using deadly force under the rule if the police officer had a reasonable belief that a felony had been committed and a reasonable belief that the person against whom the deadly force was used was the person who committed the felony. *Id*. Because the trial court did not properly instruct the jury on the elements of this defense, this Court reversed. *Id*. at 412-413.

In *Whitty*, this Court recognized that necessity was an essential element of the justification for a killing under the common-law fleeing-felon rule, which applied to both police officers and private citizens. *Id*. at 411, citing in relevant part *State v Dunning*, 177 NC 559; 98 SE 530 (1919) (stating that, under the common law, a police officer may use the force reasonably necessary to overcome resistance to arrest, up to and including deadly force, if *required* to effect the arrest). This Court stated that the only distinction under the common-law rule involved the level of inquiry into whether the person against whom the deadly force was directed actually committed the felony. *Whitty*, 96 Mich App at 411. Police officers, this Court explained, only had to have a reasonable belief as to both inquiries, which allowed police officers to assert the defense under circumstances when a private person could not do so. *Id*. This Court's citation to *Dunning* demonstrated that this Court understood that the element of necessity applied to both police officers and private citizens.

In 1985, the United States Supreme Court held that the use of deadly force to prevent escape was constitutionally unreasonable when applied to all felonies because there were now numerous nonviolent felonies. *Tennessee v Garner*, 471 US 1, 11; 105 S Ct 1694; 85 L Ed 2d 1 (1985). The Court held that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id*. Instead, the Court held that, consistent with the Fourth Amendment, a police officer could only use deadly force when the officer had "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id*. Nevertheless, in making its decision, the United States Supreme Court recognized that the common law—as described in a learned treatise from 1736—had provided that police officers could properly use deadly force " 'upon necessity' " when a fleeing felon could not otherwise be apprehended. *Id*. at 12. The Court, however, determined that changes in the law and technology had rendered this common-law rule obsolete: "though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied." *Id*. at 15. Accordingly, even the Supreme Court of the United States recognized that the necessity requirement applied to a police officer's decision to use deadly force under the fleeing-felon rule as early as 1736.

After the United States Supreme Court's decision in *Garner*, there was some question as to whether the fleeing-felon rule remained the same when applied as a defense to a criminal charge. Our Supreme Court held that the decision in *Garner* did not automatically modify this state's adherence to the common-law rule. *People v Couch*, 436 Mich 414, 416-417; 461 NW2d 683 (1990) (opinion by BOYLE, J). Justice BOYLE, who wrote for three justices,[7] questioned whether

---

[7] In *Couch,* Justice LEVIN, writing for two justices, agreed that the decision in *Garner* did not modify this state's criminal law and agreed that the Court should decline to modify the criminal law. *Id*. at 424 (opinion by LEVIN, J.). He wrote separately only to express that he saw no reason to address whether the Court had the authority to modify the common-law rule after the Legislature

the Court had the authority to change the common law after the Legislature codified the law of murder. *Id*. at 417-421. Justice BOYLE explained that the common law justified a homicide committed in an attempt to arrest a fleeing felon "provided he [the felon] cannot otherwise be taken," *id*. at 420 (quotation marks and citation omitted), which was the law adopted by the Court in *Gonsler. Couch*, 436 Mich at 421. Justice BOYLE did not reach the issue whether the Court had the authority to change the common-law rule because she concluded that it would not be prudent to change it. *Id*. at 422. She explained that "whether police officers or citizens should be subject to *criminal* liability for the killing of a nondangerous fleeing felon" was a question better left to the Legislature. *Id*. at 423.

In summarizing the common-law rule, Justice BOYLE repeatedly cited Perkins & Boyce, Criminal Law (3d ed), as a correct recitation of Michigan's common-law rule governing the privilege to use deadly force to apprehend a fleeing felon. *Couch,* 436 Mich at 420 n 7; 422 n 9; 423 n 10 (opinion by BOYLE, J.) In that treatise, the authors related that the private person's common-law privilege to use deadly force to effect an arrest differed from the application of the same right by a police officer: "If the arrest was on a reasonable suspicion of felony thought to have been committed by the arrestee, who was in fact innocent, the officer was privileged to use deadly force *if necessary to overtake the arrestee*, but a private person was not." Perkins & Boyce, *supra*, p 1099 (emphasis added). The authors stated that the English common law did not require officers to act at their peril in the way that it did private persons because officers have a duty to enforce the law; nevertheless, the authors noted that a police officer's use of deadly force must be reasonably necessary:

> It is quite otherwise in the case of an officer who has the duty of enforcing the law imposed upon him for, while it is quite proper to require him to exercise reasonable care, it is most improper to require that in performing his duty he must "act at his peril." Unfortunately some courts in this country have held that an officer arresting on suspicion of felony does act at his peril in this regard, but under the prevailing view, if the arrest itself is lawful and is for felony, the officer is privileged to use deadly force if this *reasonably seems to be the only means by which the arrest can be accomplished*. [*Id*. at 1100 (emphasis added).]

The summary of the fleeing-felon rule stated in Perkins & Boyce[8] is consistent with our Supreme Court's approval of the instruction in *Gonsler*, our Supreme Court's summary of the rule

---

codified the crime of murder. *Id*. at 425. Notably, Justice LEVIN did not question the lead opinion's summation of the fleeing-felon rule. See *id*. at 424-426.

[8] Notably, however, Perkins & Boyce also recognized that "[t]ime and again the privilege of an officer to use deadly force if necessary to stop a fleeing felon has been announced with no mention of any limitation based upon the grade of the felony involved, and often it has been in a case in which the apprehension was for a felony of the nondangerous grade . . . ." "When nothing is involved other than the effort to stop one in flight, it would seem wise to limit the use of deadly force, but this should be a matter of legislative action and should not be adopted by a court in a

in *Couch*, and this Court's clarification of the rule in *Whitty*. See *Couch*, 420 Mich at 420 (opinion by BOYLE, J.); *Gonsler*, 251 Mich at 446-447; *Whitty*, 96 Mich App at 411.

On appeal, defendant relies heavily on the fact that the published authorities generally involved charges against a private citizen, not a police officer, when asserting that this state does not impose a necessity requirement on a police officer's decision to use deadly force to effect an arrest. Nevertheless, both the Michigan Supreme Court and this Court accurately and explicitly summarized the common-law rule as it applied to police officers. Indeed, although worded in different ways, it is beyond reasonable dispute that the prevailing view of the common law, which was adopted in this state, provides that a police officer would be privileged to use deadly force to apprehend a fleeing felon if—and only if—the use of deadly force was *necessary* to prevent the felon's escape.[9] See *Garner*, 471 US at 12 (recognizing that the common law allowed a police officer to use deadly force when a fleeing felon could not otherwise be stopped); *Couch*, 420 Mich at 420 (opinion by BOYLE, J.) (stating that a police officer is privileged to use deadly force to apprehend a fleeing felon when the felon cannot otherwise be taken); *Gonsler*, 251 Mich at 446-447 (stating that an officer is privileged to use deadly force when necessary to prevent the felon's escape); *Whitty*, 96 Mich App at 411 (stating that the common-law rule privileged the use of deadly force upon necessity when the fleeing felon could not otherwise be apprehended). Defendant's contention that this state did not adopt a necessity requirement for police officers is inconsistent with the authorities discussing the traditional common-law fleeing-felon rule and relies on a strained reading of *Whitty*. We therefore conclude that there is a necessity requirement for police officers under the fleeing-felon rule.

Defendant also maintains that the district court erred when it added a reasonableness requirement to the inquiry of whether the use of deadly force was necessary. Our Supreme Court approved an instruction that provided that an officer or a private person had to exercise reasonable care to prevent the escape of a felon without using personal violence, see *Gonsler*, 251 Mich at 446-447;[10] this is consistent with the prevailing view of the common-law rule, see Perkins &

---

decision which holds an officer guilty of crime for doing what was his legal duty at the time of performance." Perkins & Boyce, pp 1102-1103 (citations omitted).

[9] Defendant also discusses several unpublished decisions applying the published authorities. Unpublished decisions are not binding on this Court, but may be persuasive. *People v Swenor*, 336 Mich App 550, 563 n 7; 971 NW2d 33 (2021). Nevertheless, because the published decisions establish necessity as an element of the fleeing-felon rule, we need not discuss the unpublished decisions.

[10] On appeal, defendant maintains that a majority of the justices in *Couch* did not adopt the recitation of the common law approved in *Gonsler*, and so, he maintains, that recitation is not binding on this Court. In *Gonsler*, the Supreme Court specifically identified the trial court's instruction and approved it as a correct recitation of the common-law fleeing-felon rule. The Court's approval also demonstrated that it had adopted that common-law defense as properly applicable to murder charges in Michigan. The Supreme Court's decision in *Gonsler* is binding on this Court without regard to whether a majority of justices reaffirmed it at a later date. See *People v Mitchell*, 428 Mich 364, 369-370; 408 NW2d 798 (1987).

-17-

Boyce, Criminal Law (3d ed), p 1100 (stating that, under the common-law rule, an officer is privileged to use deadly force if the use of deadly force seems to be *reasonably necessary* to accomplish the arrest). To hold otherwise would be to impose an undue burden on the police officer to show that his or her use of deadly force was absolutely necessary to apprehend the fleeing felon. Instead, consistent with *Gonsler*, a police officer will be justified in taking a fleeing felon's life if it was reasonably necessary for the officer to use deadly force in order to prevent the felon's escape. *Gonsler,* 251 Mich at 446-447. Accordingly, defendant has not shown that the district court necessarily abused its discretion by misapplying the law when it determined that defendant would not be privileged to use deadly force to prevent Lyoya from fleeing unless the use of deadly force was reasonably necessary to prevent Lyoya's escape. See *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017).

The amici argue that this Court should adopt a reasonable-police-officer standard for the fleeing-felon rule. Our Supreme Court has already identified the correct standard for assessing whether a police officer's use of force to effect an arrest was reasonable: " 'the measure is generally considered to be that which an ordinary prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances.' " *Doss*, 406 Mich at 102, quoting 5 Am Jur 2d, Arrest, § 81, p 768. This Court is not at liberty to adopt a new standard. See *People v Mitchell*, 428 Mich 364, 369-370; 408 NW2d 798 (1987).

The district court determined that there was evidence from which a person of average intelligence might conclude that it was not reasonably necessary for defendant to shoot Lyoya to prevent his escape. In making that determination, the district court noted that at the "instant" the shot was fired, Lyoya was "not in a position of actively escaping or fleeing." Although the district court referred to the instant that defendant fired his weapon, it does not appear from the context that the district court felt that the law required it to examine whether the use of deadly force was necessary at that exact moment to prevent escape. Rather, the district court had earlier addressed all the evidence tending to show that Lyoya resisted arrest and was trying to escape. The district court also noted that there was evidence that Lyoya had disarmed defendant and that defendant was exhausted. Nevertheless, the district court recognized that defendant pulled his weapon and pointed it at the back of Lyoya's head when Lyoya was prone and not in a position to threaten defendant or effect an escape.

The district court's comment reflected that a reasonable juror viewing the video evidence might conclude that defendant still had options available to him to prevent Lyoya's escape without shooting Lyoya. For example, because Lyoya had fallen to the ground and defendant was positioned on top of him, there appeared to be nothing to prevent defendant from backing off Lyoya, standing, and attempting to assert control at gunpoint without firing his weapon and while awaiting his backup. Given the totality of the circumstances, a reasonable jury could find that defendant was justified in using deadly force to end Lyoya's resistance to arrest. Examining the circumstances of the shooting, however, a reasonable jury could also find that defendant either fired his weapon for reasons other than to effect an arrest or that it was not yet reasonably necessary to use deadly force when defendant did. Because the evidence allowed for diverging inferences, the dispute has to be resolved by a jury at trial and not by the district court at the preliminary examination. See *Hudson*, 241 Mich App at 278-279.

-18-

Accordingly, the district court did not abuse its discretion when it declined to dismiss the charge of second-degree murder on the ground that defendant had a complete defense under the fleeing-felon rule.

### 3. USE OF FORCE TO MEET FORCE

We also find that defendant has failed to show that the district court erred when it determined that an officer's privilege to use force during an arrest in response to the arrestee's use of force should be analyzed under the principles applicable to self-defense.

Our Supreme Court discussed the use of force to make an arrest and the defense of justification in challenging a police officer's bind over on manslaughter charges in *People v Doss*, 406 Mich 90; 276 NW2d 9 (1979). In *Doss*, the Supreme Court found the magistrate did not abuse his discretion in binding over police officer Doss for trial on manslaughter charges after he shot a man he believed was an accomplice to the breaking and entering of a gas station. While at the scene of the crime and after arresting one person exiting the gas station, a second man walked from behind the station. Officer Doss instructed this second man to stop, but he continued to walk away and turned once he reached the street, holding a long object in his hands (it was later discovered to be a chair leg or spindle). Officer Doss fired one fatal shot, killing the man. *Id.* at 94. The district court magistrate bound Doss over for trial, despite "numerous questions of fact the defense has raised at examination summations pertaining to self-defense." *Id. at 95.*

The *Doss* Court held that police officers have the right to use reasonable force to effect an arrest and the right to use reasonable force to protect themselves during an arrest. *Id*. at 101-102.[11] Because of the duties applicable to a police officer, the police officer does not have to retreat before using force. *Id*. at 102. Although a police officer has the discretion to determine the amount of force to use in making an arrest, the force must be reasonable under the circumstances. *Id*.; see also *Firestone v Rice*, 71 Mich 377, 386, 387; 38 NW 885 (1888) (stating that an officer is bound to act "humanely, and cannot lightly and without reason either arrest or harshly treat a supposed offender," but may only use such force as was "reasonable and right"); *Tope v Howe*, 179 Mich App 91, 106; 445 NW2d 452 (1989) ("If a police officer lawfully arrests an individual, he may use reasonable force if that individual resists."). Additionally, a police officer cannot use deadly force in defense of self or to effect an arrest unless the officer reasonably believed that he or she was in great danger and that the use of deadly force was necessary. *Doss*, 406 Mich at 102-103; see also *Whitty*, 96 Mich App at 411 (recognizing that the use of deadly force during an arrest may be justified under the fleeing-felon rule or when the attempted arrest is met with force, in which case the rules of self-defense apply).

Like this case, *Doss* involved a police officer and the question of a bindover. But unlike this case, it involved a charge of manslaughter rather than murder. Also unlike this case, *Doss* did

---

[11] The officer's right to use nondeadly force to protect himself or herself is analogous to the right of every citizen to use reasonable force for his or her own protection. See *Kent v Cole*, 84 Mich 579, 581; 48 NW 168 (1891) (approving the lower court's instruction that a person is privileged to use reasonable force to defend against an unlawful attack, but can be liable for an assault if he or she uses force out of proportion to what may be necessary).

not involve a physical struggle between the suspect and the officer, with the suspect disarming the officer. Rather, there appears to have been some distance between the defendant and the suspect. who was holding a chair leg or spindle in his hands. *Doss*, 406 Mich at 94. Although the focus of the examining magistrate was self-defense, as was the Supreme Court's, the Court did discuss the more general topic of the use of force in making an arrest:

> In the case at bar, the only controverted issue of fact is whether the homicide was justifiable. Defendant argues that he was justified in using deadly force with the decedent either in self-defense or on the basis that, as a police officer, he was authorized to use whatever force was reasonably necessary in arresting the decedent.
>
> In *Delude v Raasakka*, 391 Mich 296, 303; 215 NW2d 685, 689 (1974), this Court said:
>
> "The police have the right to use that force reasonable under the circumstances to effect an arrest. The police may also take what action is reasonable to protect themselves in the course of an arrest or an attempted arrest."
>
> As to what constitutes "reasonable force," see 5 Am Jur 2d, Arrest, § 81, p. 768, where it is stated:
>
> "*What amounts to reasonable force on the part of an officer making an arrest usually depends on the facts in the particular case, and hence the question is for the jury.* The reasonableness of the force used must be judged in the light of the circumstances as they appeared to the officer at the time he acted, and the measure is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances. The officer has discretion, within reasonable limits, to determine the amount of force which the circumstances require, and he is not guilty of wrong unless he arbitrarily abuses the power confided in him." [*Doss* 406 Mich at 95, 102-103; emphasis added.][12]

---

[12] A more recent (2018) version of 5 Am Jur 2d, Arrest, § 81, pp 849-850, revises the rule to state as follows:

> "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, without regard to the officer's underlying motivation, subjective feelings, or intent. Because an officer's actions in an excessive force case are evaluated under an objective standard, an officer's belief as to what was happening is irrelevant, and, instead, what is relevant is whether a reasonable officer would have believed the facts to be as the officer believed them to be and whether a reasonable officer would have determined the use of force was necessary under those facts. . . . Whether the officer's force was

Moreover, our Supreme Court in *People v Couch*, 436 Mich 414, 416; 461 NW2d 683 (1990), concluded that *Tennessee v Garner*, 471 US 1; 105 S Ct 1694; 85 L Ed 2d 1 (1985), "did not 'automatically' modify this state's criminal law with respect to the use of deadly force to apprehend a fleeing felon." And, because the issues of apprehending a fleeing felon and the use of force to effectuate an arrest are closely intertwined, we could conclude that the same principle applies to the use of force to effectuate an arrest as well.

On appeal, defendant attempts to distinguish *Doss* on the ground that the facts of that case did not involve an attempted arrest that was met with force. The officer in that case argued that he should not have been bound over for trial because he acted in self-defense or had the right to use whatever force was reasonably necessary to effect an arrest. *Doss*, 406 Mich at 101. The Court agreed that he had the right to use whatever force was reasonable to effect the arrest or defend himself, *id*. at 101-102, but the Michigan Supreme Court did not agree that the officer had the right to immediately resort to deadly force. Rather, the Court explained that the officer could only use deadly force under the principles applicable to a claim of self-defense. *Id*. at 102-103. The *Doss* Court concluded that, because there were factors that tended to cast doubt on the reasonableness of the officer's use of force, the magistrate did not abuse his discretion in binding the defendant over for trial: "[t]he record indicates that the question of whether the force used by defendant was excessive under the circumstances was properly left for the jury." *Id*. at 103.

Whether and to what extent an officer may use force to effect an arrest was squarely at issue in *Doss*, and the Court clarified that "like the private citizen, the police officer who claims self-defense must have *reasonably* believed himself to have been in great danger and that his response was necessary to save himself therefrom." *Id*. at 102. Accordingly, defendant's attempt to distinguish *Doss* is unavailing. See *Alexander v Riccinto*, 192 Mich App 65, 69; 481 NW2d 6 (1991) (stating that *Doss* set forth the standard applicable when a police officer is prosecuted for conduct taken during an arrest and noting that the Supreme Court held that the law of self-defense applied to the officer's use of deadly force).[13]

Defendant's reliance on the decision in *Whitty* to establish that officers have the right to use deadly force whenever they are met with force during an arrest is also misplaced. In *Whitty*, 96 Mich App at 411, this Court stated: "Under the common law, the use of deadly force in making an arrest can be divided into two categories; the use of deadly force when the person making the arrest is met with force from the person who is to be arrested, and the use of deadly force when

---

reasonable may not be judged with the 20/20 vision of hindsight." [Footnotes omitted.]

Our Supreme Court has not yet determined whether this newer explanation is consistent with its determination in *Doss*.

[13]This Court in *Alexander* cited *Doss*, where "the Supreme Court held that the determination of reasonable force hinges upon the facts of the particular case and was thus a question for the jury." *Alexander,* 192 Mich App at 69. "Like a private citizen, though, the officer must have a reasonable belief of great danger before responding with the appropriate amount of force to foreclose the threat." *Id.*

necessary to prevent the person who is to be arrested from fleeing." Defendant cites this statement for the proposition that a police officer always has the right to use deadly force when arresting someone who resists with force. Defendant ignores the fact that this Court also explained that the "first" stated justification for the use of deadly force was "generally analyzed under principles of self-defense, although there may be differences such as forgoing the necessity of retreat." *Id*. When read together, this Court's statement of the law was consistent with our Supreme Court's explanation of the law in *Doss*.

Defendant also relies on *Fiedler* for the same proposition, but the Court in *Fiedler* cited *Whitty* for the proposition that an officer can use deadly force when met with force during an arrest without recognizing that the Court in *Whitty* also clarified that the law applicable to self-defense governed that use of deadly force. See *Fiedler*, 194 Mich App at 693-694. Additionally, the Court in *Fiedler* was only concerned with whether the circuit court properly applied the fleeing-felon rule. *Id*. at 693 ("The circuit court ruled that no crime was committed, because it found that defendant's killing of Maben was justified under the common-law fleeing-felon rule."). For that reason, it did not need to determine whether the officer's use of deadly force might have been justified because the decedent had resisted arrest. In any event, this Court is bound by the decision in *Doss*. See *Mitchell*, 428 Mich at 369-370.

Defendant has not shown that the district court misapplied the law when it determined that his use of force during the incident was governed by the law applicable to self-defense and the law applicable to the use of deadly force under the fleeing-felon rule. See *Everett*, 318 Mich App at 516.

### 4. POLICE OFFICER ACTING IN SELF-DEFENSE

Defendant has also failed to show that the district court misapplied the law of self-defense when considering whether to bind over him to the circuit court.

On appeal, defendant argues extensively about the standard that he would like to see adopted in Michigan for evaluating whether a police officer's decision to shoot and kill a person was done in self-defense. Nevertheless, the fact remains that our Supreme Court settled that matter in *Doss*. The Court specifically stated that when using deadly force, "like the private citizen, the police officer who claims self-defense must have *reasonably* believed himself to have been in great danger and that his response was necessary to save himself therefrom." *Doss*, 406 Mich at 102 (emphasis added); see also *People v Garfield*, 166 Mich App 66, 79; 420 NW2d 124 (1988). Accordingly, defendant had the same right to defend himself using deadly force that any citizen would have; as such, he would be justified in killing Lyoya only if he honestly and reasonably believed that his life was in imminent danger or that there was a threat of serious bodily harm. See *People v Kurr*, 253 Mich App 317, 320-321; 654 NW2d 651 (2002); see also MCL 780.972(1)(a). Because our Supreme Court has already determined the relevant standard for determining whether a police officer justifiably used deadly force in self-defense, this Court is not free to adopt a different standard and the district court cannot be faulted for applying that standard. See *Mitchell*, 428 Mich at 369-370.

There was evidence from which a reasonable jury could infer that defendant reasonably believed that Lyoya posed an imminent threat to his life or an imminent threat of great bodily

harm. See *Kurr*, 253 Mich App at 320-321; MCL 780.972(1)(a). There was evidence that Lyoya physically pulled away from defendant, resisted defendant's efforts to pin him down, deflected defendant's attempt to immobilize him with a Taser, and ultimately disarmed defendant of the Taser. There was also evidence that defendant had become physically exhausted trying to subdue Lyoya. There was also evidence, however, from which a reasonable finder of fact could find that defendant did not reasonably believe that Lyoya, during that point in their struggle, posed an imminent threat to his life or threat of great bodily harm.

The video evidence showed Lyoya physically resisting defendant's efforts to subdue him, but the video did not depict Lyoya physically attacking defendant—such as by punching him or striking him with his knee. The video evidence permitted an inference that Lyoya had also gotten fatigued and was less able to resist. The evidence further showed that defendant had called for assistance from other officers and that those officers were on their way, though it is not clear that defendant know how long before the officers would arrive.

There was evidence that Lyoya deflected defendant's Taser away from himself and eventually wrestled it from defendant, but there was also evidence that both cartridges from the Taser had been fired into the ground. There was some testimony that, without having at least one probe on or near a person's skin, the Taser could not cause neuromuscular incapacitation that immobilizes a person but the drive stun function could cause pain and, if applied to certain parts of the body, could cause serious injury. Defendant was trained in the use of the Taser and its drive stun mode, but there was no evidence that Lyoya attempted to use the Taser against defendant either as a Taser or as a drive stun device. Furthermore, no precedent exists in Michigan to find that possession of a twice-fired Taser, with drive stun capabilities, is a dangerous weapon per se, but the evidence presented at the preliminary examination would justify the jury in concluding that it is. Indeed, even the prosecutor's witness from Axon testified that it would inflict serious bodily harm.[14] A reasonable jury could find that defendant knew that the Taser still posed a serious danger after the discharge of both cartridges, but it is a question for the jury to decide. *Doss*, 406 Mich at 103.

The video evidence also established that defendant had successfully forced Lyoya facedown to the ground again and was positioned on top of him when he pulled his firearm. Although there was evidence that Lyoya was trying to get back to his knees, a reasonable jury might conclude that defendant was not in imminent danger when he chose to aim his firearm at the back of Lyoya's head and fire it. Additionally, Captain McKersie admitted on cross-examination that there might have been additional options available to defendant before resorting to deadly force. Finally, there was evidence that other officers arrived to assist defendant within less than one minute after he shot and killed Lyoya.

---

[14] Bryan Chiles, senior investigations engineer at Axon responsible for conducting forensic investigations on Taser weapons. In addition to describing a Taser's functioning, he testified at the preliminary hearing regarding the drive stun's operation, its ability to cause pain, and its ability to cause neuromuscular incapacitation (NMI) if someone knelt on a discharged Taser probe and were drive stunned at the same time. Sergeant Nicholas Calati, the fourth officer on the scene after the shooting, testified that he was "drive stunned" during training and "felt incapacitated."

The district court did not err when it determined that there was evidence presented at the preliminary examination that both supported and refuted defendant's claim that he shot Lyoya in self-defense. The district court properly concluded that it was for the jury to resolve any conflicts in the evidence. See *Hudson*, 241 Mich App at 278-279.

We must also determine whether the district court applied the correct standard in reviewing the evidence. On the one hand, the district court consistently referred to the reasonable person standard and did not explicitly state that it was to be viewed from the perspective of a police officer in defendant's position. On the other hand, the district court was clearly aware that defendant was a police officer. Further, the district court did acknowledge that the determination of reasonable and necessary must be "based on all of the circumstances." And part of the district court's analysis was based on Capt. McKersie's testimony, particularly regarding testimony about the alternatives available to defendant on his duty belt, as well as recognizing the challenge presented to police officers, stating in a footnote:

> The Court does not raise these examples to suggest that defendant's actions exceeded what was reasonably necessary. To be clear, this Court expresses no opinion on that matter or the ultimate guilt or innocence of defendant (as explained previously, that is not the question before this Court). Law enforcement officers are required to make split-second decisions of life and death which cannot be judged through 20/20 vision of hindsight from the vantage point of the judge's bench. See *Graham v Connor*, 490 US 386, 396 (1989). It is precisely for this reason that defendant must be bound over for trial to allow a jury to make that factual determination taking into account all of the evidence produced at a full and fair trial.

While this is a close question, we are satisfied that the district court did analyze this issue from the perspective of an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances. *Doss*, 406 Mich at 102. Accordingly, we must proceed to determine whether the district court abused its discretion in concluding that plaintiff sufficiently established that defendant was not justified in using deadly force in self-defense. MCL 780.961(2).

In its opinion, the district court recognized the strength of defendant's self-defense argument, but concluded that there was at least enough evidence at the probable cause level to justify binding defendant over for trial:

> While defendant has made strong arguments that the circumstances establish reasonableness and necessity, this Court cannot make that determination here at the preliminary examination as a matter of law. The evidentiary record from the preliminary examination contains enough to allow a person of average intelligence to conclude that defendant's fear was not reasonable or that the defendant's shooting of Lyoya in the back of the head was not reasonably necessary.
>
> Captain McKersie testified that it's not clear to him whether Patrick Lyoya was merely trying to get away or was prepared to offensively attack defendant.

Captain McKersie also recounted a number of examples of alternative techniques that may have been available to defendant. Based on the testimony, the threat or danger that the Taser presented may not be the same depending on whether it was only capable of delivering a "drive stun" at the time of the shot without resulting in NMI. And, it is not clear whether defendant knew, or should have known, that both of the Taser's cartridges had been discharged.

These are all circumstances that *might* affect how a factfinder would assess the necessity question. While the Captain is of the opinion that the techniques and actions defendant applied were appropriate, a juror would be free to conclude that under the circumstances the use of deadly force in the manner it was used by defendant was not reasonably necessary.

Accordingly, for purposes of the probable cause standard, there is sufficient evidence from which a jury could conclude that defendant did not reasonably believe that his life was immediately at risk or could otherwise conclude that the use of the particular force was not reasonably necessary.

We agree that there is at least sufficient evidence presented at the preliminary examination to establish probable cause that defendant's actions did not satisfy the standards for use of deadly force in self-defense.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Colleen A. O'Brien